**STATE of Missouri, Respondent,**

v.

**Louis TAYLOR, Appellant.**
**No. 47339.**

Supreme Court of Missouri,

Division No. 1.

Oct. 12, 1959.

Louis Taylor, pro se.

John M. Dalton, Atty. Gen., Hugh P. Williamson, Asst. Atty. Gen., for respondent.

COIL, Commissioner.

A jury convicted defendant Louis Taylor of murder in the second degree and fixed his punishment at commitment to the Department of Corrections for a term of fifteen years. He has appealed from the ensuing judgment, and contends first that the trial court erred in submitting the issue of murder in the second degree.

Defendant was convicted of second-degree murder at a prior trial on this same charge and that judgment was reversed

and the case remanded for the trial court's failure to have given an instruction on manslaughter. State v. Taylor, Mo., 309 S. W.2d 621. The evidence adduced at the instant trial was essentially the same as that at the prior trial and there, as here, defendant's first assignment was that the trial court erred in submitting the issue of defendant's guilt of murder, asserting in support there and here that at best the evidence was sufficient only in justifying the submission of defendant's guilt of manslaughter.

The state's evidence tended to show that Fred Dotson owned a house about 1½ miles south of Rolla and had invited Ralph Bailey, defendant Louis Taylor, and deceased William Burrus to stay with him and that both defendant and deceased had been staying there for at least two weeks prior to the occurrence in question. On the night of December 14, 1955, Dotson, Bailey, Taylor and Burrus had retired in the same room, two in a double bed, one in a single bed, and deceased on a mattress on the floor. Dotson said that defendant and deceased got into a fight which lasted for from one to two hours; that defendant knocked deceased down on the bed with a stick of wood which, by other testimony, was said to have been 18 to 20 inches long and 2 inches in diameter.

Raymond Heflin, who at the time lived close to the Dotson house, stopped there about six or seven in the morning of December 15, 1955. He said that Burrus was then lying on a mattress on the floor and that Taylor was cursing him and threatening to kill him; that defendant then went to Burrus and stomped on his face and throat, and later threw a stick of wood at him; that he (Heflin) asked Taylor to quit bothering Burrus, whereupon Taylor again stomped the deceased.

William Bone, who also lived near the Dotson house, testified that defendant Taylor was at his (Bone's) house on December 14, 1955, and at that time said that he was going on down to the Dotson house and that if Bill Burrus (the deceased) was there, "hard to tellin' what might happen there." Bone further said that about seven the next morning defendant came to borrow coffee and at that time said, "You probably know what happened down there by the looks of me," and that at that time Taylor had stains on his clothing and on his hands (the stains on his shirt, trousers, and right shoe were shown by other evidence to have been human bloodstains); that he returned later with Bailey, and Bone gave him some lighter fluid with which he unsuccessfully attempted to remove the stains; that defendant Taylor returned to Bone's house a fourth time when Dotson, Bone, and Mrs. Bone were present, and Taylor asked Dotson "if he could go down there and go ahead and finish him off and get rid of him or not, and Mr. Dotson made the statement then to leave him alone, that 'you had done enough to him now.' " Troopers of the state highway patrol arrived at the Dotson home about noon on the 15th and at that time defendant told Bone that if he opened his mouth to the troopers he might get the same thing "as happened down there."

A grocer in Rolla testified that defendant Taylor had been in his store on December 15 and said, "I killed Bill Burrus" and showed him a stain on his body or shirt; that he said he killed him " 'cause what he done to Fred yesterday," and that the day before Burrus had unsuccessfully tried to charge some groceries to Fred Dotson.

Deceased was taken to the hospital about 12:30 on December 15 and died a short time later. He had a cut under his left eye, severe bruises on the left side of his forehead near the hairline, his head was badly swollen, there was fluid under his scalp, he had numerous injuries to his head and face, and his nose was badly fractured. The cause of death was cerebral compression caused by a jolting of the brain due to trauma to the head.

■ We need not set forth defendant's testimony for, while he gave a different version from that supported by the state's

evidence, in considering the sufficiency of the evidence to justify the submission or to support the conviction of second-degree murder, we accept as true the evidence favorable to the state and the favorable inferences reasonably to be drawn therefrom, and reject evidence contrary to and in conflict with such favorable evidence. State v. Harmon, Mo., 243 S.W.2d 326, 331 [7].

As we have heretofore noted, the evidence adduced at the former trial was essentially the same as the instant evidence, and our reasons for holding that the trial court did not err in submitting the issue of defendant's guilt of second-degree murder at the second trial are the same as the reasons which were well stated in the prior opinion. It was there said,

" * * * we bear in mind that the existence or nonexistence of malice determines whether a homicide is murder in the second degree or manslaughter. State v. Ferguson, 353 Mo. 46, 182 S.W.2d 38; State v. Lawson, 360 Mo. 95, 227 S.W.2d 642. * * *

"Intentional homicide with malice aforethought could be reasonably inferred from the State's evidence introduced in the instant case, particularly the evidence tending to show defendant's conduct * * * in striking * * deceased with a stick of wood * * * or the fist intermittently * * * and in 'stomping' him when he was lying prone on the mattress, * * *. We particularly note the evidence tending to show the statements of defendant indicating there was bad feeling on the part of defendant toward deceased and that defendant had [killed Burrus] because Burris apparently had attempted to procure groceries to be charged to Dotson's account. Testimony of statements made by defendant in the late afternoon of December 14th, before the fight, and in the morning of December 15th, after the occurrences of the preceding night, was indicatory

that prior to the fight defendant entertained a preconceived malicious design to kill. Nor was it fatal to the substantiality of the State's case that the evidence did not definitely tend to show by what specific means defendant struck the fatal blow. A stick of wood * * * may be a deadly weapon when used to cause death, and it is not an essential element of murder in either degree that the killing be done with a deadly weapon, or any weapon at all; the crime may be committed with the fist. State v. Lawson, supra; State v. Rizor, 353 Mo. 368, 182 S.W.2d 525." State v. Taylor, supra, 309 S.W.2d 623, 624. (Bracketed insert present writer's.)

We have reviewed Dotson's testimony in the light of defendant's contention that it was "so contradictory, conflicting, evasive and indefinite in so many particulars that it is entirely incredible and unbelievable." We are of the opinion, however, that while, as pointed out by defendant, certain interpretations of Dotson's testimony may have disclosed some inconsistencies and some portions of it may have been contradictory or in some respects not apparently reasonable, still, considering his testimony from a standpoint favorable to the state, it reasonably may not be said that its probative force and effect was destroyed. We have also considered the testimony that there was drinking and that one or more of the persons in the Dotson home were drunk and the testimony from which it might be inferred that there was a "brawl" at Dotson's on the evening of December 14 in connection with defendant's contention that the "killing occurred as a part of a drunken brawl which would support a conviction for manslaughter * * * but not * * * for murder * * *." While there was evidence that defendant and his companions were drinking, the evidence did not compel the conclusion that defendant was not in full possession of his faculties when he committed the alleged acts which resulted in Bur-

rus' death. The conflicts, contradictions and evasions, if any, in Dotson's testimony and the evidence of brawling and its effect were for the consideration of the jury in the performance of its function to weigh the evidence.

■ As was said on the prior appeal, "We have the opinion that the State's evidence was substantial in tending to show that the homicide was committed intentionally and with malice aforethought, and that the trial court did not err in submitting the issue of defendant's guilt of murder in the second degree to the jury." State v. Taylor, supra, 309 S.W.2d 624[4].

■■ Defendant's contentions that the trial court erred in permitting unfair argument on the part of the prosecuting attorney and in permitting the state's attorney to unfairly and continuously interrupt and harass defendant's attorney during his jury argument may not be determined for the reason that the only portions of the arguments of either counsel which are set forth in the transcript are two short statements by the prosecutor which obviously have nothing to do with the portions of the argument to which defendant refers in his present assignments. And statements contained in a motion for new trial or in the assignments of error in a brief do not prove themselves. State v. Gaddy, Mo., 261 S.W.2d 65, 68[11–13].

Defendant contends that the trial court erred in permitting the prosecuting attorney to exhibit in the view of the jury bloody clothing taken from defendant, asserting that such procedure was highly inflammatory and improper inasmuch as the exhibition of the clothing was entirely unnecessary to prove any fact sought to be proved by the state. The difficulty with that contention is that the record does not support it. On the contrary, the record shows that when a trooper of the State Highway Patrol was on the stand, the prosecuting attorney showed him exhibit S-7 which was a bloodstained shirt that had been worn by defendant. Defendant objected to that exhibit and to any articles of clothing on the ground that such were purely inflammatory and unnecessary. The court sustained the objection to exhibit 7. The trooper then identified exhibit 8 which was a shovel which had been found in the room in the Dotson house, and the defendant objected to that exhibit. No ruling was made, but a conference among court and counsel was had, the subject or contents of which is not disclosed in the record. Thereafter it was developed that the shirt and the shovel had both been taken to the highway patrol laboratory. Then a pair of shoes (exhibit 9) was shown to the witness which he identified as shoes worn by defendant at the time of his arrest. Thereafter the prosecuting attorney referred to state's exhibit 10. The record shows the following then occurred:

"Mr. Bradford: Now I object to Mr. White continually producing those clothes and exhibiting them to the jury.

"The Court: Well, he has to show it to the witness.

"Mr. White: I'm holding these clothes around behind me so the jury can't see too much.

"The Court: That's all right. Overruled. Go ahead."

Thereafter the prosecuting attorney had the patrolman identify exhibit S-10 as the trousers and S-11 as the jacket which defendant had worn which had been taken to the laboratory for analysis of stains on them. It was then developed by the testimony of the patrolman that the stains on those various exhibits were analyzed and that the stains on the shirt and pants and right shoe were human bloodstains. Thereafter the court sustained defendant's objection to the clothing and the shovel when they were offered in evidence.

■ It is of course clear that the jury knew that the highway patrolman was identifying certain garments as those worn

by the defendant at the time of his arrest and that he testified that an analysis showed that some of those garments contained bloodstains of the same blood type as that of deceased and of a different type from that of defendant. But the record does not show that those articles of clothing were *exhibited* to the jury. On the contrary, the only reasonable conclusion from the record is that the trial court was of the opinion that the prosecuting attorney was exhibiting the articles only to the witness and was doing it in such a way that either the jury did not see the articles or did not see them sufficiently to have been in any way inflamed or prejudiced against defendant by their appearance. It was not error for the trial court to have permitted the highway patrolman to identify the exhibits and to testify concerning them, and inasmuch as the trial court sustained defendant's objections to the introduction in evidence of the exhibits and inasmuch as the record fails to show that the exhibits were in fact exhibited to the jury, it is clear that there is no merit in defendant's present contention. State v. Gaddy, supra, 261 S.W.2d 68 [11–13].

Defendant's final contention is that the court erred in permitting the prosecuting attorney in cross-examining defendant "to practically read the entire testimony given at the former trial for the purpose of attempting to discover some discrepancy or conflict between the testimony given at this trial and that which he gave at the former trial." The record shows that on the cross-examination of defendant he said that when he came into the room in the Dotson house where Burrus was lying, Bailey was standing over Burrus with a stick in his hand. The prosecutor asked whether he had ever said that before. He answered that he thought he had. Whereupon the prosecutor inquired whether a certain question had been asked and answer given at the former trial. The prosecutor then proceeded to read a series of questions and answers which were purportedly asked and answered during de-

fendant's testimony at the former trial. No objection whatever was made by defendant to that procedure. The prosecutor then inquired whether a series of questions (covering several pages of the transcript) were asked and answers given by defendant at the coroner's inquest without any objection by defendant. The record shows that this then occurred:

"Mr. Bradford: I object to Mr. White just reading the entire testimony there at the Coroner's Inquest. If he wants to read a half-dozen questions, I wouldn't have any objection, but he's read about 25 already and it looks like he's going to read—and—and he looks like he intends to read the entire inquest testimony of the defendant there at the inquest. I don't think that's proper.

"The Court: What is the purpose of reading it all, Mr. White?

"Mr. White: I'm not reading it all, Your Honor, I just read some of that in between which may have not been too relevant, but I'm getting to the meat.

"The Court: Well, get down to the matters that you want.

"Mr. White: All right."

█ The cross-examination then proceeded without further objection by defendant, except one which pertained to the form of a question and not to the fact that it concerned testimony given at the coroner's inquest. It is obvious from the foregoing review of the record that defendant is in no position to now claim that the trial court erred in permitting too many questions to be asked on defendant's instant cross-examination pertaining to his testimony at a former trial and at the coroner's inquest.

We have examined the sufficiency of the information, verdict, judgment, and sentence, and find them sufficient and proper.

The judgment is affirmed.

HOLMAN and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.