**STATE of Missouri, Respondent,**

**v.**

**Robert Lee SELLE, Appellant.**

**No. 49386.**

Supreme Court of Missouri,
Division No. 1.

May 13, 1963.

John C. Pohlman, William H. Costello, Kansas City, for appellant.

Thomas F. Eagleton, Atty. Gen., Ike Skelton, Jr., Sp. Asst. Atty. Gen., Jefferson City, for respondent.

PER CURIAM.

Defendant, Robert Selle, was indicted for making an assault with malice aforethought upon one Theresa Rooney and beating her with his fists with force likely to produce death or great bodily harm, with felonious intent to ravish and rape her. Section 559.-180. (All statutory references are to RSMo 1959, V.A.M.S., and all references to rules are to our Rules of Criminal Procedure, V.A.M.R.) Upon trial he was found guilty and his punishment was fixed at imprisonment in the penitentiary for a term of three years. From the ensuing judgment and sentence, he appeals.

About 11:30 P.M. on Saturday, May 20, 1961, Theresa Rooney, then nineteen years of age, came home after "a date." She usually slept in the same upstairs bedroom with her mother; but, to avoid disturbing her mother who had been ill, on this occasion Theresa partially undressed, slipped on a robe, and lay down on a couch in the living room with a comforter over her. Early in the morning, she was awakened when someone started to pull the cover off her. Still "half asleep," she first thought that it probably was her mother; and, glancing at the clock on the mantel, she turned on her stomach. When the cover started coming off again, she realized that it was not her mother and that someone was crouching on the floor. Turning on her side and starting to raise up, she saw a man "leaning over the couch about a foot and a half from me." As she looked at him, "he raised up real quick and he hit me; and I started to screaming and the more I screamed, the more he hit." In an effort to protect her face and head, she "flopped back" on her stomach and put her hands over her head.

Aroused by the screaming, her parents quickly came downstairs, but by the time they reached her the intruder was gone. Theresa was bleeding from a laceration on her lower lip; and the blows which had been rained upon her resulted in swelling and discoloration around the left eye—"a real good shiner," bruises on her face which were still noticeable eight weeks later, bruises on her left wrist and forearm with "hemorrhage under the skin into the muscle," and "lumps and sore places all over the back of (the) neck and head." Theresa's father discovered that both the outside door to the basement garage and the kitchen door at the top of the basement stairs were open after the assault, although both had been closed the previous evening.

The assault occurred about 4:45 A.M., only some thirteen minutes before sunrise as we may note judicially. State v. Powell, Mo., 306 S.W.2d 531, 533(2), 66 A.L.R.2d 1141; Haley v. Edwards, Mo., 276 S.W.2d 153, 161(12). There were several windows in the living room, the blinds either "had been taken down to be washed or they were all the way up," and Theresa said that "it was light" in the room. When investigating officers arrived, Theresa gave them a description of her assailant; and, from "yearbooks" brought by the of-

ficers that same day, she "picked out" defendant's picture. In "the lineup" at the police station on the following day, i. e., on Monday, May 22, and at the trial, she positively identified defendant. In the course of the assault, the clasp on Theresa's wrist watch was opened—"it was out like this (indicating)." When arrested on the evening following the assault, defendant had "small round wounds" on his forearms.

When officers went to defendant's home about 8:00 P.M. on Sunday, May 21, they found defendant, his wife, and two men identified as Frank Harmon and Ronald Heibert. They arrested Heibert, for whom they had a warrant on another offense, and took him to jail. About forty-five minutes later, they returned to defendant's home and took him into custody. When questioned by the officers, defendant first stated that his wife had been at home with him "the entire night" of the assault. However, his subsequent story to the officers and upon trial (then supported by his father-in-law and his wife) was that she, being pregnant and ill, had stayed at the home of her parents that night, but that, when she had become "more ill" during the night, her father had brought her home between 4:30 and 5:30 A.M. so that defendant could take her to a doctor. Defendant further said that, on the evening of Saturday, May 20, he had played the drums in an orchestra at the Tropical Bar in Kansas City; that he got off work at 1:00 A.M., waited around to get paid, and left the bar about 1:30 A.M. with Ronald Heibert, who had been living with him about one week; and that, as he and Heibert walked out of the bar, his landlord, Frank Harmon, who was waiting for him, "asked if I (defendant) had the rent money" and "I said 'yeah.'" On the way home in his 1949 Plymouth, defendant stopped for brake fluid. When he got home, defendant "worked a little bit on my television—it quit working that afternoon." Heibert "put hot dogs on the stove and I (defendant) cooked some mush and we ate." Then, "I played my guitar a little while before we went to bed." Defendant was awakened by his wife when her father brought her home early in the morning. He denied that he had ever been in the Rooney home. He was eighteen years of age at the date of the assault and nineteen at the time of trial in November 1961. Neither Heibert nor Harmon testified.

■■ Turning to defendant's complaints (although not in the order of their presentation in his brief), we consider first the refusal to quash the indictment because (so it is alleged) only one witness testified before the grand jury and that witness did not testify to a material fact. The transcript shows no more than that *at least one* witness appeared before the grand jury. What he testified, we do not know. It is true that a grand jury must hear evidence *before returning an indictment*. State v. Faulkner, 185 Mo. 673, 84 S.W. 967, 973; State v. Grady, 84 Mo. 220. But the grand jury is the judge of the sufficiency of the evidence before it. State ex rel. Clagett v. James, Mo., 327 S.W.2d 278, 284; State v. Shawley, 334 Mo. 352, 67 S.W.2d 74, 82; State v. Bragg, Mo.App., 220 S.W. 25, 28 (8, 9); State v. Randolph, 139 Mo.App. 314, 123 S.W. 61, 62(1). The motion to quash properly was overruled.

■■ Error is assigned in that Circuit Judge James S. Rooney "was without jurisdiction" to preside at the arraignment or "to pass on (defendant's) application for change of venue." The assault occurred in the home of Judge Rooney and the victim was his daughter. The indictment was returned on May 24, 1961. On June 9, 1961, defendant filed application for change of venue on account of the bias and prejudice of the inhabitants of Clay County. On June 12, 1961, the cause was transferred to the Circuit Court of Carroll County *pursuant to written stipulation signed by the prosecuting attorney, defendant and his attorney*. The only authority cited to this point in defendant's brief is Section 545.660 [see Rule 30.12], which provides that a circuit judge shall be disqualified *"to hear and try"* any criminal case in which the

judge is in any wise interested or prejudiced. (All emphasis herein is ours.) Neither the cited statute nor the superseding rule disqualified Judge Rooney from receiving the indictment. State v. Millsap, 310 Mo. 500, 276 S.W. 625, 628(3); State v. Goddard, 162 Mo. 198, 62 S.W. 697, 708 (22). Of course, a trial judge should retire and proceed in accordance with Rules 30.13 and 30.14 whenever prejudice is suggested either by affidavit pursuant to Rule 30.12 or by his own conscience [State v. Huett, 340 Mo. 934, 104 S.W.2d 252, 258(5)], and we entertain no doubt but that Judge Rooney would have disqualified himself if the defendant had not voluntarily entered into the written stipulation to transfer the case to another circuit. As the record stands, we can find no violation of or prejudice to defendant's rights under the above-stated assignment.

■ Another complaint is that "five" reputable citizens testified under oath in the Circuit Court room of Carroll County that they saw Judge Rooney * * * in the jury room with the door closed with members of the jury present and saw conversation in the hallway between members of the Rooney family and members of the jury." This point was raised in the motion for new trial, on which the transcript indicates that evidence was heard. But, if so, such evidence was not included in the transcript, and nothing therein supports the quoted statement. Neither assignments in motions for new trial nor points in appellate briefs prove themselves [State v. Taylor, Mo., 327 S.W.2d 880, 884(4); State v. Gaddy, Mo., 261 S.W.2d 65, 68(11, 13); State v. Lay, Mo., 61 S.W.2d 738, 739 (6)], and certainly we should not and do not, on the unconfirmed assertion of counsel, impugn the integrity of those against whom this charge is leveled. Nothing is presented for review under this point. State v. Daniels, Mo., 347 S.W.2d 874, 880 (10).

■ In connection with defendant's earnest contention that the state failed to make a submissible case, we observe preliminarily that an assault with the fists may be a force likely to produce death or great bodily harm. State v. Gillespie, Mo., 336 S.W.2d 677, 680; State v. Spradlin, 363 Mo. 940, 254 S.W.2d 660, 661. However, pointing out that malicious assault *with intent to rape* was charged, defendant argues that there was "no proof of any overt act" and no evidence from which an intent to rape might have been inferred. True, an essential element of an offense under Section 559.180 is a specific intent to do one or more of the things there named, in this instance (as the indictment charged) the specific intent to rape [State v. Martin, 342 Mo. 1089, 119 S.W.2d 298, 301; State v. Arvin, Mo., 123 S.W.2d 182(1); State v. Hardy, 359 Mo. 1169, 225 S.W.2d 693, 696; 6 Am. Jur.2d Assault and Battery, § 20, p. 24], i. e., an intent to gratify the passions upon the person " 'at all events and notwithstanding any resistance on her part.' " State v. Fleming, Mo., 177 S.W. 299, 302. But the assault is complete "(i)f the intent, with the present means of carrying it into effect, exists, and preparations therefor have been made" [State v. Shroyer, 104 Mo. 441, 16 S.W. 286, 287; State v. Pinkard, 318 Mo. 751, 300 S.W. 748, 751(4); State v. Knoch, Mo., 14 S.W.2d 424(1)], even though there has been no actual violence to the person. State v. Shroyer, supra. And the fact that, by reason of resistance or discovery, the defendant abandons his purpose does not change the character of the assault or purge him of the offense. State v. Hewitt, Mo., 259 S.W. 773, 778(2); State v. Merricks, Mo., 18 S.W.2d 23, 25(4); 1 Wharton's Criminal Law and Procedure, § 326, loc. cit. 669.

■ Intent frequently is not susceptible of direct proof, and it may be inferred from facts and circumstances which legitimately so permit. State v. Chevlin, Mo., 284 S.W.2d 563, 566(4); State v. Pinkard, supra, 300 S.W. loc. cit. 751; 22 C.J.S. Criminal Law § 33, p. 118; Underhill's Criminal Evidence (4th Ed.), § 596, loc. cit. 1168. In determining the sufficiency of the

evidence to support a conviction, it is our duty to view the evidence in the light most favorable to the state, to accept all substantial evidence and all legitimate inferences fairly deducible therefrom which tend to support the verdict, and to reject contrary and contradictory evidence. See cases collected in 9A West's Missouri Digest under Criminal Law, ☜1144(13). It is within the province of the jury to interpret and weigh the evidence; and, where different inferences are reasonably deducible therefrom, it is for the triers of the facts to determine which inference shall be drawn and we may not cast aside their inference for another of our own choice. State v. Brewer, Mo., 325 S.W.2d 16, 20(10); State v. Berkowitz, 325 Mo. 519, 29 S.W.2d 150, 153(5); Brown v. United States, 8 Cir., 237 F.2d 281, 283(2); 1 Wharton's Criminal Law and Procedure, § 324, loc. cit. 666.

■ We turn again to the evidence. Although Theresa had "paid no attention" to defendant at the time, he had, on the Tuesday prior to the night of assault, accompanied his pregnant wife on a prenatal visit to the office of the doctor where Theresa was employed. Admittedly, defendant had never been in the Rooney home prior to the night of assault. There was a considerable sum of money in a purse on the studio couch "around the corner from the kitchen" (Theresa and her mother were to have left on Sunday, May 21, on a trip to Europe), but there was no evidence that anything of value had been taken or disturbed. So, it would seem that the triers of the facts reasonably might have rejected any inference that, in committing the unlawful act of entry into the Rooney home, the intruder had been motivated by an intent to steal. Certainly, his act in pulling the comforter off Theresa could not well have been regarded as manifesting no more than an intent to steal that particular item of relatively trivial value. When Theresa was aroused, the intruder beat her in such brutal and unmerciful fashion that she soon might have been rendered completely helpless but for the alacrity with which her family re-sponded to her outcry. What *was* the intruder's purpose? "Certainly not to say his *pater noster.*" State v. Smith, 80 Mo. 516, 519. By the instructions, the jurors were offered an opportunity to find defendant guilty of lesser assaults but the tendered alternatives were rejected in favor of the one upon which defendant was convicted. We conclude that they had the right to draw the inference which they did, and that the state made a submissible case.

This brings us to the complaint that the trial court erred in overruling defendant's motion for a mistrial and in refusing to discharge the jury when, on cross-examination of Mrs. Maxine Martin, the second of defendant's two character witnesses, the assistant prosecuting attorney asked: *"If you had heard that Robert Selle was directly connected by grand jury indictment in five separate distinct sex crimes, would you still think his reputation is good?"* In our effort to appraise the situation created and the prejudice injected by the quoted question (to which we hereinafter refer as *the sex crimes question*), we briefly examine the backdrop against which this question was posed. After Mrs. Kella Brown, the first character witness, had testified on direct examination to defendant's good reputation for morality and peace, she was subjected to vigorous cross-examination in the course of which the following questions, among others, were propounded: "Q. If you had heard that Robert Selle was associated with known criminals, would you still think his reputation was good?" "Q. If you had heard he was associated and associating with criminals, and harboring criminals in his house * * * If you had heard that, would you think his reputation is good?" "Q. If you had heard that he had been connected with a known sex pervert, would you think his reputation is good?" To the objections (both insufficient and ineffective) to the first two of these questions, the court respectively responded, "He can examine as to what she knows" and "The court has to assume he is in good faith." There was no objection to the third question. On redirect

examination witness Brown said that she "never did hear that (defendant) had anything to do with anything of that type of life."

Mrs. Maxine Martin, the second character witness, likewise testified on direct examination to defendant's good reputation for morality and peace and, on cross-examination, likewise was asked (before the sex crimes question): "Q. If you had heard that Robert Selle was harboring a wanted man in his house, would you still think his reputation is good?" In this setting, *the sex crimes question* was put to witness Martin, prompting defendant's counsel to move immediately for a mistrial. An extended colloquy ensued outside the presence of the jury. "For the purpose of proving the good faith of the State in asking the (sex crimes) question * * * and in further asking the question relative to the marking (sic) of a criminal," the assistant prosecuting attorney offered to prove "that there were returned by the grand jury of Clay County, Missouri, five indictments against Frank Harmon, who was charged with committing sodomy on five different, separate occasions upon Robert Selle" and also "that Ronald Heibert was, on May 21, 1961, charged with the commission of a crime, and that on that date he was in the home of this defendant, and that he has since been found guilty of a crime." The subsequent discussion suggested, but left (for us) unanswered, questions (1) as to whether defendant was, as his motion for new trial characterized him, "the victim in said cases" and, as his counsel here assert, "the complainant in the above indictments," and (2) as to whether the sodomitical acts, whatever defendant's role therein may have been, were committed while he was under the age of seventeen years and a ward of the Juvenile Court of Clay County, as his counsel have stated repeatedly. In this connection, see the caveat in State v. Richardson, Mo., 364 S.W.2d 552, 555. When the trial was resumed before the jury, the court's ruling was: "The motion for a mistrial is overruled. *. * * Ladies and gentlemen of the jury, the court has sustained the objection to the last question, and you shall disregard any import of that question as it stands now."

The well-established general rule is that proof of the commission of separate and distinct crimes by the defendant is not admissible, unless such proof has a legitimate tendency to establish defendant's guilt of the charge for which he is on trial. State v. Summers, Mo., 362 S.W.2d 537, 542(10); State v. Atkinson, Mo., 293 S.W.2d 941, 942(1); State v. Reese, 364 Mo. 1221, 274 S.W.2d 304, 307; State v. Shilkett, 356 Mo. 1081, 204 S.W.2d 920, 922–923(1). But while the soundness of the practice has been questioned [3 Wigmore on Evidence (3rd Ed.), § 988, pp. 617–624; Bishop, Impeachment and Rehabilitation of Witness by Character Evidence in Missouri, 20 Mo.L.Rev. 142–186, 273–306], cross-examination of a character witness may include inquiries in good faith as to whether he has heard rumors or reports of specific acts of misconduct (not remote or ancient) which would reflect upon defendant's character. State v. Livers, Mo., 340 S.W.2d 21, 26(6); State v. Cox, Mo., 333 S.W.2d 46, 49(2); State v. Cooper, Mo., 271 S.W. 471, 473–474(2–4). However, it should be kept in mind that such cross-examination is permitted to test the knowledge of the witness, the trustworthiness and accuracy of such knowledge, the basis for his judgment, his candor, and his credibility [State v. Slade, Mo., 338 S.W.2d 802, 807(11); State v. Havens, Mo., 177 S.W.2d 625, 629; State v. Carson, Mo.App., 239 S.W.2d 532, 536 (5)], but *not* "to prove by rumor or common report" that defendant has been guilty of other specific crimes. State v. Wellman, 253 Mo. 302, 161 S.W. 795, 799(5). See also State v. Mahan, Mo., 267 S.W. 866, 868(3); State v. Hulbert, Mo., 228 S.W. 499, 501(3).

In an effort to guard against misuse or abuse, whether by inadvertence or by design, of the accorded right of cross-examination of character witnesses, we

have warned (as others also have) that, in such cross-examination, it is improper to propound hypothetical questions which assume supposed facts and call for an opinion predicated thereupon. State v. Carroll, Mo., 188 S.W.2d 22, 24(4); State v. Clark, 353 Mo. 470, 182 S.W.2d 619, 624(10); State v. Seay, 282 Mo. 672, 222 S.W. 427; Little v. United States, 8 Cir., 93 F.2d 401, 408(10), certiorari denied 303 U.S. 644, 58 S.Ct. 643, 82 L.Ed. 1105, rehearing denied 303 U.S. 668, 58 S.Ct. 756, 82 L.Ed. 1124; Pittman v. United States, 8 Cir., 42 F.2d 793, 795–797(8, 10); 58 Am.Jur., Witnesses, § 661, p. 364; annotation 47 A.L.R.2d 1258, 1306–1312. "(C)ross-examination should not be permitted to be used to covertly convey to the minds of jurors suspicion and prejudice as to a defendant by a recital as facts of supposed matters not appearing in the evidence and wholly outside of the case." Pittman v. United States, supra, 42 F.2d loc. cit. 797. In other words, prosecuting officials should not be permitted in this fashion to convey to the jury by innuendo and insinuation purported information which they are forbidden to impart directly. Cf. State v. Barker, Mo., 249 S.W. 75, 78; State v. Shipley, 174 Mo. 512, 74 S.W. 612, 613; State v. Jones, 306 Mo. 437, 268 S.W. 83, 87. The sex crimes question in the instant case was patently improper and grossly unfair. See particularly State v. Seay, supra.

The inquiry remains as to whether the *asking* of the sex crimes question (although there was no answer and the jurors were told to "disregard any import of that question *as it stands now*") introduced prejudicial error into the trial. In considering that subject, we have in mind that the intent to commit a sex offense was an essential element of the crime charged, and that the jury necessarily had to find this element by inference. The plain and purposeful implication of the sex crimes question was that defendant had been "directly connected by grand jury indictment in five separate distinct sex crimes"; and, unless the jurors were endowed with extraordinarily keen perspicacity, the question would, at first

blush, have carried the connotation that defendant himself had been indicted for five separate sex crimes. In any event, the question must have wafted into the jury box the shadowy stench that defendant was a repeated sex offender; and, coming from the prosecuting official, who is regarded by the average man as knowledgeable about such things, the assumption of the purported facts recited in the question no doubt became something more than a mere insinuation thereof.

 A prosecuting attorney is a quasi-judicial officer [State ex rel. Griffin v. Smith, 363 Mo. 1235, 258 S.W.2d 590, 593 (1)] entrusted and charged not only with the important responsibility to prosecute vigorously and fearlessly in behalf of the state but also with the no less positive obligation to see that every defendant so prosecuted nevertheless is accorded a fair trial. State v. Allen, 363 Mo. 467, 251 S.W. 2d 659, 662(4). Thus it plainly becomes his duty to refrain from conduct calculated to engender prejudice or excite passion against a defendant [State v. Tiedt, 357 Mo. 115, 206 S.W.2d 524, 526–527(1, 2)] and to "avoid injecting into the minds of the jury any matter which is not proper for their consideration, or which would add to the prejudice which the charge itself has produced in their minds." State v. Horton, 247 Mo. 657, 153 S.W. 1051, 1054.

This court frequently has been impelled to the conclusion that the asking of improper questions or the making of improper statements has injected poison and prejudice that could not be neutralized by the sustention of defendant's objections. In most of such cases, the transgressions have been persistent and repeated. E. g., State v. Spencer, Mo., 307 S.W.2d 440; State v. Allen, supra; State v. Tiedt, supra; State v. Lasson, 292 Mo. 155, 238 S.W. 101, 103–104(5); State v. Burns, 286 Mo. 665, 228 S.W. 766, 768; State v. Stetson, Mo., 222 S.W. 425; State v. Seay, supra; State v. Webb, 254 Mo. 414, 162 S.W. 622, 628(7). However, in some instances, a single inci-

dent or offense has introduced prejudicial error and has required reversal. E.g., State v. Shipley, supra, 74 S.W. loc. cit. 613; State v. Teeter, 239 Mo. 475, 144 S.W. 445, 447–448(5); State v. Taylor, 330 Mo. 1036, 51 S.W.2d 1003, 1007. See also State v. Burchett, Mo., 302 S.W.2d 9.

■ In the case at bar, the cross-examiner propounded to defendant's character witnesses a series of hypothetical questions, each of which improperly assumed supposed facts and called for an opinion predicated thereupon. But, with respect to the improper questions *prior to the sex crimes question,* the objections by defendant's counsel were not adequate and timely [State v. Slaten, Mo., 252 S.W.2d 330, 333–334(3–5)] and no error was, or properly could have been, assigned in the motion for new trial [Rule 27.20; State v. Morris, Mo., 248 S.W.2d 847, 852], so we are limited to the sex crimes question as to which there was an adequate and timely motion for a mistrial and a particularized assignment of error in the motion for new trial. However, we are of the considered opinion that the sex crimes question, climaxing as it did a series of patently improper but obviously less prejudicial questions, injected poison that was not neutralized by the relatively mild comment that "the court has sustained the objection to the last question, and you shall disregard any import of that question *as it stands now."* "It is practically impossible for a man sitting in judgment to exclude from the final make-up of his mind facts which have lodged there, even if the court gravely tells him that such facts should not have been disclosed, and tells him, further, not to consider them. *The court does not tell him that such statements are not true. The objections by counsel for defendant probably convince him that they are true."* State v. Lovan, 245 Mo. 516, 538, 151 S.W. 141, 147. So we think that, in the case at bar, the situation was not ameliorated by the fact that no answer was permitted or given, for it was the assumption of the supposed facts in the question that poisoned and polluted.

State v. Spencer, supra, 307 S.W.2d loc. cit. 445; State v. Burns, supra, 228 S.W. loc. cit. 768.

■ Resolution of an issue as to whether prejudicial error has been injected into a case should not depend solely upon the number of transgressions or offenses. For, "(p)rejudice, as it affects the defendant's legal rights, is not a matter of degree. If the defendant was prejudiced to any extent by the improper evidence (or by the improper questions or statements of counsel), it was undue and we cannot say that the defendant had a fair and impartial trial according to the law and the evidence." State v. Burchett, supra, 302 S.W.2d loc. cit. 15(2). "It makes no difference how regular the proceedings at the trial are, if prejudice finds its way into the verdict, that verdict cannot stand." State v. Webb, supra, 162 S.W. loc. cit. 628; State v. Tiedt, supra, 206 S.W.2d loc. cit. 527. See also State v. Allen, supra, 251 S.W.2d loc. cit. 662(5).

■ Where, as here, the charged offense is one of unspeakable bestiality which naturally arouses and inflames the emotions, it becomes all the more important and essential that the prosecuting officials exercise appropriate restraint. State v. Tiedt, supra, 206 S.W.2d loc. cit. 529; State v. Seay, supra, 222 S.W. loc. cit. 429. "To say that (defendant) is guilty, and therefore it makes no difference how he was tried, begs the question, and is but an argument favoring the return to primitive justice, which first hangs and then investigates. If the latter method had met the demands of civilization (even though it be charged, and this case and these disjointed times partly prove that civilizaton is but skin-deep) it is probable that it would not have been abandoned for the present system, which among its necessary elements requires a judiciary sworn to follow the law and the Constitution." State v. Guerringer, 265 Mo. 408, 419–420, 178 S.W. 65, 68; State v. Dixon, Mo., 253 S.W. 746, 749; State v. Taylor, supra, 51 S.W.2d loc. cit. 1007.

There are other assignments of error (as to instruction 4 and the form of verdict) which appear to be not without merit. But, in view of the conclusion already reached, we need not discuss them, since upon retrial these (now alleged) errors and deficiencies may be easily avoided.

For the prejudicial error hereinbefore noted, the judgment is reversed and the cause is remanded for a new trial.

All concur.