**STATE of Missouri, Respondent,**

v.

**Lazaro Alor CORONA, Appellant.**

No. 13510.

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 11, 1985.

Motion for Rehearing or Transfer
Denied Feb. 1, 1985.

Application to Transfer Denied
April 2, 1985.

Lew A. Kollias, C.J. Larkin, Jefferson City, for appellant.

John Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

Appellant ("Corona"), charged with committing the class B felony of burglary in the first degree, § 569.160.1(3), RSMo 1978, by unlawfully entering an apartment occupied by B—— J. P—— ("complainant") "for the purpose of committing forcible rape therein," was found guilty as charged by a jury, which assessed punishment at seven years' imprisonment. The trial court imposed that sentence and Corona appeals, briefing two assignments of error. The first is that the trial court erred in denying Corona's motion for judgment of acquittal at the close of all the evidence because the evidence "was insufficient as a matter of law to sustain a charge of burglary with intent to commit forcible rape in that the evidence failed to establish any intent to commit the felony of rape, an essential element of the charge." The second is that the trial court erroneously received evidence of Corona's prior convictions.

In considering Corona's first point, we view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences to be drawn therefrom, and we ignore contrary evidence and inferences. *State v. Guinan*, 665 S.W.2d 325, 327 (Mo. banc 1984). The test is whether the evidence, viewed in that light, is such that a rational trier of fact could have found beyond a reasonable doubt that Corona was guilty. *State v. Bonuchi*, 636 S.W.2d 338, 340[1] (Mo. banc 1982), *cert. denied*, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 446 (1983); *Jackson v. Virginia*, 443 U.S. 307, 322–325, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560, 576–77 (1979).

The record of Corona's activities on the date in question (Saturday, December 18, 1982) begins at 1:20 a.m., when he was issued a traffic citation by Police Officer Tom Gann at the intersection of Glenstone Avenue and Commercial Street in Springfield. Corona, driving a "blue Mercury" without license plates, was ticketed for "running a flashing red light."

Gann noticed three things that later became significant: (1) Corona had a "slight odor of intoxicants" about his person that "smelled like beer," (2) Corona had no injuries on his hands, and (3) the taillights of Corona's Mercury were undamaged.

After detaining Corona "5 to 7 minutes, something like that," Gann permitted Corona to drive away in the Mercury.

Less than a half hour later, at 1:53 a.m., Teresa Bartkoski, asleep in her apartment at 2103 South Ingram Mill Road in Springfield, was awakened "by a noise outside." Ms. Bartkoski, whose apartment, according to the evidence, is between four and five miles from the site where Corona had been stopped by Officer Gann, looked outside and observed a man pick up a hat out of a parked automobile and put the hat on his

head. He then walked to an apartment complex at 2120 South Ingram Mill, across the street from Ms. Bartkoski's apartment, and disappeared.

Ms. Bartkoski, who was "kind of alarmed," noticed that the automobile, a "late model Mercury," had no license tag.

Complainant, who lived alone in a second floor "studio apartment" in the complex at 2120 South Ingram Mill, was asleep in bed, her outside door secured by a dead bolt and two chains, when she was awakened by a knock at the door, 15 to 20 feet from her bed. As she arose to investigate, the door "was busted open" and a man ran inside toward her. Complainant "just started screaming instantly and started fighting."

Complainant, clad in a nightgown and "underpants," was knocked "back across the bed on my back." At that point, explained complainant, "I was fighting him to keep him off of me, and he grabbed my legs and pulled me down on the floor." Then, in complainant's words: "I was slapped around in the head. Knocked around in the head. I couldn't keep my hands and fists up in front of me and was slugging and screaming at the same time. ... I kept slugging and fighting. And finally, his hand—his hand come down over my face. His hand got in my mouth, and I bit. I bit as hard as I could. At this time, he yelled, screamed, and ran out the door. I don't know what he screamed. ... It sounded like a male voice...."

Although no lights were on in her apartment, complainant was able, because of an outside light that shone in, to see that the intruder was wearing a "French cap" and a striped sweater. She could not, however, see his facial features or determine whether he was black or white.

After the assailant fled, complainant turned on a light and looked at the door. She saw "that the whole wooden frame area about a foot-and-a-half long where all the locks was on the outside of the door there had been busted off and was just

swinging in the air." This made it impossible for complainant to close the door.

Complainant "was just so panicky" that she dialed the telephone operator, who put the call through to the police. Complainant fixed the time of the call as "a couple of minutes after 2:00." During the call, complainant looked toward the area where the fight had occurred and saw "a beer bottle in the floor that was never there before."

Ms. Bartkoski, who had evidently been maintaining surveillance since observing the man at 1:53, saw the same man run toward the Mercury, hat in hand. Upon reaching the Mercury, the man jumped in, throwing the hat in the back. Then, according to Ms. Bartkoski, the man "backed out and proceeded to hit my car," apparently breaking a taillight on the Mercury. The Mercury sped north on Ingram Mill Road. Ms. Bartkoski immediately reported the incident to police by telephone, fixing the time of her call as "a little after 2:00."

Police Officer Gary Dishman received a report of the "attempted rape" about 2:05 a.m., and shortly thereafter observed a Mercury, carrying no license plates, traveling north on Glenstone Avenue. As the Mercury matched the description he had been furnished, Dishman pursued it, stopping it at a point which, according to the testimony, was some two miles from complainant's apartment.

Corona was the driver of the Mercury, and Dishman noticed "what appeared to be a fresh injury" to Corona's right thumb. Asked why he believed the injury was fresh, Dishman replied, "Well, it had dried blood on it, small amount of dried blood. It hadn't been, like, cleaned off or anything."

Dishman also observed that a section of taillight had been broken on the right rear of the Mercury. According to Dishman, "There was some small pieces of the taillight still laying inside the housing of the taillight section where they hadn't fallen out yet." Dishman looked inside the Mercury and retrieved a "cap" from the "rear floorboard."

At some point during these duties, Dishman placed Corona under arrest.

Officer Gann, who had ticketed Corona about an hour earlier, arrived at the arrest scene and noted the broken right taillight on the Mercury. Gann also observed that Corona was wearing the same striped pullover shirt that he had been wearing when Gann issued the traffic citation. On Corona's right thumb, Gann saw "what appeared to be a fresh laceration" that had not been there at the time of their earlier encounter.

Ms. Bartkoski, escorted to the arrest scene by a police officer, identified Corona's Mercury as the automobile that had struck her car at her apartment, specifically noting the Mercury's broken taillight. She noticed that Corona, who was in a "paddy wagon," appeared to be wearing the same shirt as the man she had seen in front of her apartment.

Corona was taken to police headquarters where photographs were taken of his right thumb. During that process, Sergeant Gary L. Kissinger overheard Corona say "that his dog had bitten him." Corona, according to Kissinger, "demonstrated by holding his thumb up to his mouth and pretending to bite down on his thumb as if the—in the manner in which the dog had bitten him."

Officer Dishman, also present in the booking room while Corona was there, testified that Corona "indicated he had cut his thumb with a knife."

During daylight hours on the morning of December 18, Ms. Bartkoski went to police headquarters and was shown the hat found by Officer Dishman in Corona's Mercury and the shirt Corona had been wearing when arrested. She identified both as articles worn by the man she had seen in front of her apartment.

Complainant also went to police headquarters on December 18 and was shown Corona's hat and shirt. She testified the hat appeared to be the same one worn by her attacker and that the shirt looked like the one he had worn. Upon viewing Corona, complainant concluded he was the "same sized person" as the assailant, with the same hair length.

On the afternoon of December 18, Corona was questioned by Detective Don Pippin and Corporal Truly Applegate about his right thumb. Corona stated he had cut it with a knife at work.

In his defense, Corona testified he did not break into complainant's apartment and that at the time of his arrest he was en route home, having eaten a late snack at a restaurant, the name of which he was unable to recall. Asked whether he knew complainant, Corona admitted that from August of 1981 until the summer of 1982, a period of about nine months, he had resided in an apartment at the complex where complainant lived, "around 3 doors from her." According to Corona, he had a girl friend who lived in the apartment next door to complainant.

Corona insisted that neither he nor his Mercury was near complainant's apartment on December 18, and that the taillight was broken when he purchased the Mercury four or five months previously.

■ In arguing his first point, Corona does not dispute that there was evidence to establish that he broke into complainant's apartment and used force upon her. He maintains, however, that there was no evidence that his actions were intended to force complainant to submit to sexual intercourse. Citing *State v. Asberry*, 559 S.W.2d 764, 767[3] (Mo.App.1977), Corona asserts the State was obliged to prove that when he entered complainant's apartment, he intended (a) to have sexual intercourse with her, and (b) to use whatever force was necessary to overcome her resistance. *See State v. Brown*, 217 S.W.2d 546, 548[2–6] (Mo.1949); MAI–CR 2d 23.50 (1–1–79). Emphasizing the absence of evidence of "sexual overture," Corona contends there was no proof that the attack was sexually

motivated. He correctly points out that complainant testified her assailant neither touched her in a sexual manner nor made any sexual comment. There was likewise no testimony that the attacker made any effort to remove or grab complainant's clothing. Indeed, complainant testified: "I don't know if he was there to have sex with me or kill me. I was fighting him. I was terrified out of my mind."

Corona refers us to several cases in which convictions for assault with intent to commit rape were reversed because of failure of proof that the attacker's purpose was to have sexual intercourse with the victim forcibly and against her will, by using such force as would overcome her resistance. They include *State v. Hamm,* 577 S.W.2d 936 (Mo.App.1979); *State v. Williams,* 324 Mo. 179, 22 S.W.2d 649 (1929); *State v. McChesney,* 185 S.W. 197 (Mo.1916), and *State v. Fleming,* 177 S.W. 299 (Mo.1915). Those cases, however, do not present the exact issue that confronts us here. There was abundant evidence in each of those cases that the objective of the respective defendants was to have sexual intercourse with the victims. The proof failed because there was insufficient evidence to establish that the defendants meant to accomplish their purpose by such force as was necessary, and notwithstanding any resistance by their victims. That is, the proof was too weak to support a finding that the defendants intended, if their importunings for sexual intercourse were rebuffed, to nonetheless have their way with their victims by overpowering them, regardless of the force required.

Here, the crucial issue, in our view, is not whether Corona's violent attack on complainant manifested an intent to overcome her resistance. We believe a rational trier of fact could find that when Corona burst into complainant's apartment and simultaneously assaulted her, he meant to accomplish his objective—whatever it was—by overcoming complainant's resistance and subduing her. A rational trier of fact

could have further determined that complainant's resistance proved to be stronger than Corona expected, and that because he was unable to overpower her as swiftly as he had anticipated, and because he feared her outcries would bring others to her aid, he decided to abandon his mission and flee before rescuers arrived. *See State v. Petrechko,* 486 S.W.2d 217, 218–19[4] (Mo. 1972).

That being so, the only substantial issue regarding the sufficiency of the evidence in this case is whether a rational trier of fact could find that the purpose of Corona's attack on complainant was to compel her to submit to sexual intercourse.

On that issue, it is noted in *State v. Roden,* 674 S.W.2d 50, 53[2] (Mo.App.1984), that such intent may, and generally must, be established by circumstantial evidence, for as a rule it is not susceptible of direct proof. The evidence need not establish intent as a matter of law; it is sufficient that it authorizes such a finding by the jury. *Id.* at 53[3]; *Petrechko,* 486 S.W.2d at 218–19[3].

The Missouri case most factually akin to the instant case is *State v. Selle,* 367 S.W.2d 522 (Mo.1963), a conviction for assault with malice aforethought by force likely to produce death or great bodily harm, with felonious intent to ravish and rape, § 559.180, RSMo 1959, now repealed, Laws 1977, pp. 662–63. There a 19-year-old female, asleep on a couch in her home, was awakened about 4:45 a.m., when the defendant, crouching on the floor, started to pull a cover off her. As she looked at him, he struck her and she began screaming. He continued to hit her and she continued her outcries. Alarmed by the noise, her parents rushed to the room, but by then the defendant was gone. Doors leading outside were discovered open, although they had been closed the night before. There was no evidence that anything of value had been taken or disturbed. Rejecting the defendant's contention that there was no evidence from which an intent to

rape could be inferred, the Supreme Court of Missouri held that the jury could have reasonably rejected any inference that the defendant was motivated by an intent to steal and could have reasonably found that the assault was accompanied by an intent to rape.

In addition to the circumstances of the intrusion and assault, there are other similarities between *Selle* and the instant case.

In both cases, there was no prior relationship between the defendant and the victim, although there was evidence in each case that the defendant knew of the victim before the assault occurred. In *Selle*, the defendant, a few days before the assault, had been in the office of a doctor where the victim was employed. In the instant case, Corona had once lived in an apartment three doors away from complainant's apartment, and Corona's girl friend had occupied the apartment next door to complainant's. From that evidence, the jury could reasonably infer that Corona knew not only where complainant resided, but also that she lived alone.

In *Selle*, the intrusion occurred at a time when the victim could be expected to be in bed. The same was true in the instant case. Corona's forcible entry occurred shortly before 2:00 a.m., at a time when no lights were burning in complainant's apartment. The jury could reasonably infer from this that Corona expected to find complainant alone and in bed.

As in *Selle*, there was no evidence in the instant case of any attempt to take anything from complainant's apartment, and there was likewise no evidence that Corona had any grudge against complainant that would have motivated him to kill or injure her. If, as held by our Supreme Court, the evidence in *Selle* was sufficient to support a finding that the defendant acted with intent to rape the victim, the evidence in the instant case is likewise sufficient to support such a finding.

Corona, while acknowledging the existence of *Selle,* makes no effort to distinguish it, and we are unable to do so. On the authority of *Selle,* Corona's first point is denied.

Corona's second point arises from the following proceedings at trial.

During cross-examination of Corona, the prosecutor asked: "Mr. Corona, when you lived in Cuba, were you convicted and imprisoned for covering up a robbery?"

Outside the hearing of the jury, defense counsel[1] stated: "I will object to this as being irrelevant and prejudicial. The Prosecutor does not have any information that he was represented by counsel nor does he have any documents to establish this—that there was a robbery committed by Mr. Corona in Cuba."

The prosecutor responded by stating that in an application for asylum, Corona had indicated he was sentenced to one year for covering up a robbery and 10 years for buying stolen property in Cuba.

The trial court overruled the objection, whereupon Corona answered, "No. This is the first time I have been in jail."

The prosecutor then—without defense objection—asked Corona whether he was convicted and sentenced for 10 years for selling stolen goods in Cuba.

Corona answered, "No."

The prosecutor then handed Corona a copy of a document captioned "Request for Asylum in the United States," asking Corona whether he had signed the original of that document. There was no objection to this inquiry. Corona admitted he had signed the original.

The prosecutor then asked: "Did you not tell an Immigration Officer at Fort Chaffee that you had been in prison for one year for covering up a robbery and had been sentenced for 10 years for selling stolen goods?"

There was no objection, and Corona answered, "Yes."

---

**1.** Neither of Corona's attorneys on appeal is the    attorney who represented Corona at trial.

The prosecutor then asked: "And did you not sign this document with your signature, indicating that that was a true statement?"

There was no objection. Corona answered: "Yes. Now, can I explain the motives?"

The prosecutor immediately turned his inquiry to another subject.

During redirect examination, defense counsel asked Corona why he had told the Immigration Officer about the two crimes.

Corona explained: "I said it in Miami—Key West, Florida. I told—I said it there, and also at Fort Chaffee that I had been arrested in—on two occasions because in Cuba—we were told—we were told by the policeman that all the ones that came to the United States that were supposed—we were supposed to say when we arrived in the United States that we were—that we had been in prison or arrested. So—so they would not think that we were willing to—that's the motive why I said it that I had been arrested. . . ."

After the defense rested, the prosecutor asked the trial court's permission to read to the jury the following excerpt from the Request for Asylum: "Have you ever been arrested for any other reasons?" "X̲ Yes." "In prison 1 year for covering up a robbery. Sentenced 10 years for selling stolen goods."

The document bore Corona's signature and was dated May 19, 1980, at Ft. Chaffee, Arkansas.

Defense counsel objected "on the grounds it's not the best evidence."

The trial court granted the request and the prosecutor read the excerpt aloud.

Corona's second point, as we understand it, is that the trial court erred by (1) allowing the prosecutor to continue to question Corona about the Cuba convictions after Corona initially denied them, and (2) allowing the prosecutor to read aloud the excerpt from the Request for Asylum.

Corona tenders the point as plain error, conceding it was not preserved for review because his motion for new trial was not timely filed. *State v. Tate,* 657 S.W.2d 727, 728[1] (Mo.App.1983). In addition, we observe that the first component of the point is ineligible for review for the further reason that there was no objection at trial when the prosecutor, after Corona's initial denial of the Cuba convictions, asked Corona whether he had told the Immigration Officer at Fort Chaffee about them, and whether the Request for Asylum bore his signature. *State v. Graves,* 588 S.W.2d 495, 499[4] (Mo. banc 1979).

In determining whether Corona is nonetheless entitled to relief under his second point, we must be mindful that a defendant who seeks appellate review of a point as plain error bears the burden of demonstrating that the action of the trial court resulted in manifest injustice or miscarriage of justice. *State v. Groves,* 646 S.W.2d 82, 83[2] (Mo. banc 1983).

On that issue, we recognize, of course, that if Corona had in fact been convicted as shown on the Request for Asylum, the convictions were proper items for the jury to consider in assessing his credibility. *State v. Giffin,* 640 S.W.2d 128, 132[16] (Mo.1982); *State v. Williams,* 603 S.W.2d 562, 568–69[11] (Mo.1980); § 491.050, Laws 1981, pp. 635–36; § 546.260, RSMo 1978.

What Corona is saying, however, is that once he denied the Cuba convictions on cross-examination, the prosecutor was bound by those answers and was limited to proving the convictions, if he could, only by an admissible record thereof. *See State v. Charles,* 572 S.W.2d 193, 195–96[2] (Mo. App.1978); § 491.050, *supra.*

Assuming, without deciding, that had timely and proper objection been made, the trial court should not have allowed the prosecutor to pursue his inquiry about the Cuba convictions during Corona's cross-examination once Corona denied them, we find no manifest injustice in the trial

court's failure, *sua sponte*, to foreclose the prosecutor's inquiry.

The trial court had been told what was shown on the Request for Asylum, and was therefore aware that the prosecutor was asking about the Cuba convictions in good faith. Furthermore, as pointed out earlier, defense counsel registered no objection while the prosecutor pursued the subject. In such circumstances, the trial court's failure to intercede while defense counsel remained mute did not result in a miscarriage of justice.

Corona's complaint about the prosecutor's reading from the Request for Asylum is similarly unsound. As previously noted, during redirect examination Corona undertook to explain how the information regarding the Cuba convictions had gotten onto that document. In rebuttal, the prosecutor simply read what appeared there, which revealed nothing that the jury had not learned earlier during Corona's cross-examination.

██ It is well settled that if evidence is improperly admitted, but other evidence before the court establishes essentially the same facts, there is no prejudice and no reversible error. *State v. Zagorski*, 632 S.W.2d 475, 478 n. 2 (Mo. banc 1982). What the prosecutor read had already been established during Corona's cross-examination. Consequently, we need not decide whether the trial court erred in allowing the prosecutor to read what he did. As there was no prejudice, there could, *a fortiori*, be no plain error.

Corona's second point is, accordingly, denied.

Although Corona heretofore requested oral argument, we have, in adjudicating his two points, determined that oral argument would not be beneficial. Accordingly, the request for oral argument is denied per our Special Rule 1(e), p. 457, Missouri Rules of Court (16th ed. 1985).

Judgment affirmed.

PREWITT, C.J., HOGAN, P.J., and MAUS, J., concur.