588 A.2d 345

**Walter Pyle HAMMOND**

v.

**STATE of Maryland.**

**No. 107, Sept. Term, 1990.**

Court of Appeals of Maryland.

April 9, 1991.

452

Susan McMillan Davis (Russell J. White, White & Karceski, all on brief), Towson, for appellant.

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., and Richard B. Rosenblatt, Asst. Atty. Gen., all on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW and KARWACKI, JJ., and CHARLES E. ORTH, Jr., Judge (retired), Specially Assigned.

CHARLES E. ORTH, Jr., Judge, Specially Assigned.

I

One hundred and thirty-eight years ago the Maryland Legislature declared that it was a crime

[i]f any person ... shall assault and beat any person, with intent to maim, disfigure or disable such person....

Acts 1853, ch. 99, § 1, now codified as § 386, Article 27 of the Maryland Code (1957, 1987 Repl.Vol.). During all those years, the Legislature has never explicitly stated whether the specific intents required [1] must be to maim, disfigure, or disable *permanently.* In fact, the Legislature has addressed the statute only once during that period. As reenacted by Acts 1966, ch. 628, the Legislature did no more than increase the minimum sentence authorized from six months to eighteen months. The substance of the statute remains today as it was when the statute was first enacted.

II

Until today, this Court has never been called upon to decide if the maiming, disfigurement, or disablement intended by the assailant must be permanent or whether the intent could be to maim, disfigure, or disable temporarily. The question is squarely before us now because the jury, during its deliberations at the trial of Walter Pyle Hammond in the Circuit Court for Anne Arundel County, asked the question of the presiding judge, and defense counsel objected to his answer.

Hammond was charged by a criminal information with the commission of seven crimes. The charges stemmed from the reaction of Hammond when he entered the home of his girl friend, Peggy McElroy, and found her in bed with David Schoene. Hammond got a shovel and smote Schoene repeatedly with it, leaving Schoene bloodied and bowed.

---

1. For a discussion of specific intent, *see Shell v. State,* 307 Md. 46, 62–63, 512 A.2d 358 (1986), and *McBurney v. State,* 280 Md. 21, 28–29, 371 A.2d 129 (1977).

The jury convicted Hammond of assault with intent to maim, disfigure and disable. Sentence was imposed. Hammond appealed from the judgment. We ordered the issuance of a writ of certiorari on our own motion before decision by the Court of Special Appeals.

The trial judge instructed the jury regarding the crimes it was to consider. One of them was assault with intent to murder. He explained that offense and then said:

The next offense [ (charged in count 2) ] is called assault with intent to maim. Now again, that label is a little misleading, because we're not talking about maiming in the sense that you understand it to be. To convict the Defendant of this charge, which is captioned assault with intent to maim, the State has to prove first that the Defendant struck at the victim, same as assault with intent to murder; that the Defendant intended to disfigure or disable the victim. So, it's not with the intent to kill but there must be the specific intent to either disfigure or disable. And like assault with intent to murder it has to be committed without justification or mitigation. So, disfigure has its common, ordinary meaning. And disable means simply to incapacitate or physically impair the victim. Make your determination.[2]

After the jury had deliberated for a time, it sent a note to the judge, asking for "clarification" with respect to two of the charges. The first question, which is the one pertinent to this appeal,[3] was headed, "INTENT TO MAIM." It read: "—DISABLEMENT—MUST IT BE PERMANENT OR CAN IT BE TEMPORARY." The judge replied in writing over defense counsel's objection:

Whether any disablement is permanent or temporary is immaterial as long as there is a disablement.

---

**2.** The instruction given was in general accord with the instruction entitled "Maiming—Assault with intent to maim, disfigure or disable" suggested by the Maryland State Bar Association, Inc., Maryland Pattern Jury Instructions—Criminal § 4:21.1 (1987).

**3.** The second question concerned the charge of breaking and entering.

Hammond carries the challenge to the judge's response to us. He claims that assault with intent to maim, disfigure, or disable requires an intent to *permanently* maim, disfigure, or disable. Therefore, he urges, the judge's supplemental instruction, whether a disablement is permanent or temporary is immaterial, constituted prejudicial error.

## III

### A

Section 386 is one of a package of three statutes grouped under the subtitle "Maiming" in Article 27. The other two are now codified as §§ 384 and 385. The statutes stem from the early English common law offense of mayhem.[4] What are now §§ 384 and 385 were enacted by Acts 1809, ch. 138, § 4. (*See* Kilty, Laws of Maryland Compiled, Vol. 4, 1807–1812). Paragraph 4 of § 4, now § 384 of the Code, did no more than give legislative recognition to the common law crime of mayhem and authorize punishment for its violation. The statute has appeared in every code since its enactment and has not been touched by the General Assembly since 1809. It simply prescribed:

> Every person, his aiders and abettors, who shall be convicted of the crime of mayhem or of tarring and feathering, shall be sentenced to the penitentiary for not more than ten years nor less than eighteen months.

Paragraph 5 of § 4, now § 385 of the Code, provided:

> Every person, his or her aiders, abettors and counsellors, who shall be duly convicted of the crime of cutting out or disabling the tongue, putting out an eye, slitting the nose, cutting or biting off the nose, ear or lip, or cutting or biting off or disabling any limb or member of

---

4. " 'Maim' is the modern equivalent of the old word 'mayhem,' and some have long been inclined to abandon the earlier word entirely." Perkins & Boyce, *Criminal Law* (3rd ed., 1982) at 238. *See* LaFave & Scott, *Criminal Law* (2d ed., 1986) § 7.17 n. 5 at 697.

  Reference to "maim" or "maiming" herein encompasses "mayhem" and vice versa.

any person, of malice aforethought, with the intention in so doing to maim or disfigure such person shall be sentenced to undergo a confinement in the said penitentiary for a period of not less than two nor more than ten years....

Acts 1966, ch. 628 looked at § 385. It did no more, however, than declare the crime to be a felony, make some housekeeping changes, set the sentence upon conviction at "not less than two nor more than ten years," and change the intent in committing the proscribed acts from "maim or disfigure" to "mark or disfigure."

## B

Section 384 designated the crime of mayhem but did not define it. It was stated in Hochheimer, *The Law of Crimes and Criminal Procedure* (2d ed., 1904) (Hochheimer), § 386 at 423:

> Mayhem, or maim, is bodily hurt, or the infliction thereof, whereby a man is deprived of the use of any member of his body or any sense which he can use in fighting, or by the loss of which he is generally and permanently disabled.

Hochheimer observed that

> [m]ayhem is to be distinguished from bodily hurt involving mere disfigurement. Cutting off, disabling or weakening a hand or finger, striking out an eye or a front tooth and castration are maims; but cutting off an ear or the nose is not maim.

*Id. See* 4 W. Blackstone, Commentaries (Blackstone) *205–206 (1769); LaFave & Scott, *Criminal Law* (2d ed. 1986) (LaFave) § 7.17(a) at 696; Perkins and Boyce, *Criminal Law* (3rd ed. 1982) (Perkins) ch. 2, § 8 at 239; C. Torcia, 2 *Wharton's Criminal Law* (14th ed. 1979) (Wharton) § 204 at 336. At English common law, Blackstone said at *205–206, mayhem was "the violently depriving another of the use of such of his members as may render him the less able in fighting, either to defend himself, or to annoy his adversary." "[T]he rationale," observed LaFave, § 7.17(a) at

696, "being to preserve the King's right to the military services of his subjects."

"By a series of early English statutes (in 1403, 1545, 1670),[5] mayhem was broadened to include cutting out or disabling the tongue, severing the ear, and slitting the nose or lip." LaFave § 7.17 at 696–697. *See* Hochheimer, § 386 at 423; Wharton, § 206 at 337; Perkins, § 8, ch. 2 at 239–240.

It is apparent on the face of § 385 that it contemplates the old crime of mayhem as broadened by the early English statutes. Section 385 and the English common law after Sir John Coventry's unpleasant experience speak in terms of the same types of injuries. Thus, the Legislature has covered the field of mayhem. Section 384 encompasses the old common law crime; § 385 proscribes conduct in terms of the common law offense as broadened; § 386 creates a new offense of assault with intent to maim, disfigure, or disable.

## IV

### A

■ As we have seen *supra*, Hochheimer spoke of mayhem in terms of "permanently disabled." § 386 at 423. He does not stand alone in this view. According to Blackstone, common law mayhem covered permanent disablement of an appropriate bodily member as well as its dismemberment. *205–206. LaFave declared:

Mayhem at common law required a type of injury which permanently rendered the victim less able to fight offensively or defensively; it might be accomplished either by the removal of (*dismemberment*), or by the *disablement* of, some bodily member useful in fighting.

---

**5.** "The last of these statutes is 'called the Coventry Act, being occasioned by an assault on Sir John Coventry in the street, and slitting his nose, in revenge (as was supposed) for some obnoxious words uttered by him in parliament.'" LaFave § 7.17(b) n. 4 at 697, quoting 4 W. Blackstone, Commentaries *207 (1769).

§ 7.17 at 696 (emphasis in original). LaFave stated, "Today, by statute, permanent disfigurement has been added...." *Id.* LaFave made clear:

It is a requirement for mayhem that the disabling injury be permanent, so that the temporary disablement of a finger, arm, eye, or other member will not do.

*Id.* 7.17 at 698. Perkins spoke of mayhem in terms of a permanent injury. Ch. 2, § 8 at 239, 241, and 242. Wharton flatly declared: "At common law, and by statute, mayhem requires a disablement or disfigurement which is permanent in nature." § 206 at 337.

It has been held ... that when a statute speaks of the disablement or disfigurement of a limb or a member of the body as a maiming, a permanent injury is contemplated such as at common law would constitute a mayhem. Hence, a temporary disabling of a finger, an arm, a leg, or an eye, is not sufficient to constitute the statutory offense.

53 Am.Jur.2d § 3 at 490 (footnote omitted). *See* Annot., 16 A.L.R. 955 (1922), supplemented by Annot., 58 A.L.R. 1320 (1929).

There is no disagreement among the scholars that mayhem as it was known in ancient times and as it is known today requires a permanent injury. This is so whether the offense is spoken of in terms of maiming, disfigurement, or disablement and despite the fact that the emphasis in modern times is on the completeness and integrity of the body, rather than its efficacy in battle.

### B

We have no reason to assume that when the Legislature created the offense of assault with intent to maim, disfigure or disable a hundred and thirty-eight years ago and reviewed the statute, twenty-five years ago, it was not fully aware of the requirement at the common law that maiming, disfigurement or disablement be permanent. We noticed, *supra,* that §§ 384, 385 and 386 are all concerned with

mayhem. In *Booth v. State*, 306 Md. 172, 212, 507 A.2d 1098 (1986), reversed in part on other grounds, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), we linked § 385 and § 386. We said that "[a]n assault with intent to maim [under § 386] is an assault perpetrated with the intent to inflict one or more of the injuries described in § 385." It would be incongruous, indeed, if the Legislature, in light of the concept of the permanent nature of a maiming, which has been firmly fixed in the law since ancient times, intended, by its silence on the matter, that maim, disfigurement and disablement as they appear in § 386, need only be temporary. The intent to maim reflects the crime of mayhem, and the intent to disfigure and the intent to disable, in the context in which they appear, are inexorably bound to that crime. We cannot conceive that the Legislature, in proscribing an assault with intent to maim, disfigure or disable, thereby divorced disfigure and disable from the crime of maiming. The face of the statute does not support such a notion, the legislative history of the statute does not suggest it, and no opinion of this Court indicates it.

We hold that the trial judge erred when he instructed the jury, in effect, that if it found that Hammond assaulted Schoene with the intent to maim, disfigure or disable him, it was immaterial whether the intent was to maim, disfigure, or disable him permanently or temporarily. It was very material in the circumstances here, as a review of the evidence clearly demonstrates. We give a compendium of the evidence.

### C

The catalyst in the sordid affair, which the trial brought to light, was Peggy McElroy. She was enamored of Hammond and David Schoene, and she bestowed her affections from time to time on each of them. McElroy lived with Hammond in her home for some one and a half years. She asked him to leave the residence in June 1985, but their relationship was not completely terminated. He retained a key to the front door and spent the night there as

recently as 5 July 1989. Starting in January 1989, David Schoene moved in with her in her home. He left the following May to return to his children, but continued to visit her. She told Hammond in June that she was no longer "seeing" Schoene. Hammond did not know that McElroy and Schoene had, in fact, resumed their relationship. McElroy and Schoene were together on 9 July 1989. They went out to dinner and then returned to McElroy's home. Schoene left to go to a neighborhood bar, and, during his absence, McElroy received a phone call from Hammond. They discussed their mutual problems. Hammond told her that he would "come over in a second" if she wanted him. According to Hammond, she said she wished he would, but McElroy denied that she had said so. Schoene returned, and eventually they retired for the night, sharing the waterbed in her bedroom on the second floor.

They were awakened about 3:00 a.m. by the presence of Hammond looming over them. Hammond said that a friend drove him to McElroy's home because his car was "broke down." Hammond was unable to gain entrance by way of the front door (it now had two locks, and he had a key to only one of them). He knocked to awaken McElroy, but she did not answer. He went to the rear of the house and found the back entrance unlocked. He entered, went to the second floor bedroom, pushed open the door and walked into the room. What he saw left him "confused, very upset, and [unsure] of the situation at the time." McElroy and a man were in bed together. "[T]here wasn't any covers or anything and both of them were just laying in bed." He thought that McElroy was drunk and that the man in bed with her had taken advantage of her. Although he did not know Schoene, apparently he was satisfied that the man was Schoene. McElroy had told him that she had met Schoene at a party and that "she just dated him, and that that was over, he wasn't a nice person, he wasn't nice to the kids at all." She also told Hammond that Schoene was "a black belt and kick box champion, and that he was real tall and all...." (Hammond was six feet tall, weighed 190

pounds, and had been a military police officer for three years). His intention was "[j]ust to tell [Schoene] to leave," and he thought that he would be more persuasive if he had something with which to protect himself. He went downstairs. Although he knew where McElroy kept the kitchen knives, he did not get a knife because he did not "want anybody to get hurt, and if there is wrestling around, anything could happen." He did not see anything which suited his purpose in the living room. He went to the basement and saw a heavy metal rake, "but it had all these points on it." He did not take the rake "because with the points anything could happen, the person's eye or anything." He saw a shovel and armed himself with that. It was the subject of a photograph admitted into evidence. The photograph showed that the shovel was of the type commonly used to dig into the soil. It had a long, thick handle to which was attached a concave blade. The blade tapered to a rounded point. The edges of the blade were sharp enough to facilitate the entrance of the blade into the ground.

Hammond said that he went back upstairs "to try and have [Schoene] leave without anybody getting hurt, to try not to hurt myself." He was "hoping that [the shovel] would have been enough to at least keep him away from me, 'cause [Schoene had] a black belt." He was going to try to wake Schoene up, tell him to leave but he was afraid that Schoene would not go peaceably. So, "I figured well maybe if I hit the guy one time ... I hate to say it, but if I hit the guy one time it could stun him and [I could] just tell the guy to get out." Schoene was on his back "with his arms to his side." Hammond did not hit him in the head, nor did he hit him with the edge of the shovel or prod him with the pointed edge of the blade. "I went down on his chest ... as flat as I could ... so it wouldn't be anything serious [but] enough to stun the guy to get him out, or at least to take him off guard." Hammond backed away after he hit Schoene and said "get out." Schoene indicated a desire to leave, but Hammond kept yelling at him. Schoene

tried to get out of bed and put his left hand up to ward off the blows. Hammond said, "I was scared. I didn't know what he was going to do.... What I was afraid of [was] that he was going to try and do something, so I hit his arm here." Hammond insisted that he was not trying to maim Schoene or to disfigure him or to disable him. "I was trying to be real careful." Schoene said that he was whacked with the shovel 20 to 30 times, but Hammond "seriously doubted" that he rained that many blows on Schoene. Schoene fruitlessly attempted to ward off the blows with his left arm. Schoene headed toward the bedroom door. Nevertheless, Hammond continued to smite him with the shovel. At the top of the stairs, Schoene asked for his pants—he was "totally undressed," but Hammond told him to forget it. Hammond said he could have pushed Schoene down the stairs, but "I wasn't ruining my life for that." Hammond told Schoene to go downstairs and followed him down. At the bottom of the stairs Schoene again asked for his pants. Hammond got them from the bedroom, gave them to Schoene, opened the front door and pointed, saying "get out." Schoene left. Hammond again declared that he did not "intend to kill" Schoene and disavowed that he intended "to permanently disfigure [Schoene] or disable him."

Schoene put on his pants and fled the scene in his van. He was stopped by a police officer because the vehicle ran a red light and was weaving in its progress down the road. As the officer approached the van, Schoene fell out the door. The left side of his face and body was covered with blood. His left arm was bleeding, and it seemed that he was unable to move it. He was crying as if in pain. Another officer arrived on the scene, and she described Schoene as very emotional and very upset and with blood "splattered" from head to foot. Schoene was taken to a hospital in an ambulance. The hospital medical record was admitted in evidence. The pertinent parts are in handwriting of nurses and doctors, but as best we can make out there was no head injury. Schoene suffered abrasions,

contusions, lacerations, and bruises on the left front and back of his body, on his left arm, and on his left leg. The report of the radiologist indicated that the injuries were the result of trauma, but "no fracture, dislocation, or other bone or joint abnormality" was shown of the left forearm, left hand, and left knee. Although he was in the hospital only a couple of hours, he was in extreme pain. He was sent to a "specialist" for his hand. He testified:

> The tips of my fingers were probably a half inch longer than they are now, with blood blisters that had formed. And they were extremely painful. All four fingers were like that. This knuckle was busted open. This finger was cut.

Eighteen color photographs were received in evidence. One showed Schoene with his left arm in a sling, bandages on his left hand and fingers, a bandage on his left leg from above the knee halfway to his ankle, blood on his pants, and a pained expression on his face. Others were close-ups of his injuries—a large red bruise on the left side of his midsection, lacerations on his left arm, and another large red bruise on the left side of his upper back. There were photographs which traced his progress from the bedroom to the front door by spatterings of blood—on the bedroom rug near the bed, on the doorway of the bedroom, on the hallway next to the bedroom, on the carpet in the hallway, on the floor at the head of the stairs, on the stairway, and on the wall going down the stairs.

It was elicited from Schoene that, at the time of the trial, he did not have "any restriction on the mobility of [his] hand or arm...." The beating left Schoene with scars on his left arm and a "minor long scar" on his left leg. The scars were exhibited to the jury. Schoene claimed that the scars were permanent.

It is axiomatic that the weight of the evidence and the credibility of witnesses are always matters for the jury to determine when it is the trier of facts. *Perry v. State,* 234 Md. 48, 51, 197 A.2d 833 (1964); *Duffin v. State,* 229 Md. 434, 436, 184 A.2d 624 (1962); *Reynolds v. State,* 219 Md.

319, 326, 149 A.2d 774 (1959). On the evidence here, the jury could have found that Hammond assaulted Schoene with the intent to disable him permanently, or only temporarily. The question to the judge indicated that the jury was considering both possibilities. Inasmuch as an intent to disable temporarily would not support a verdict of guilty, the question of temporary or permanent was material indeed.

## V

■ The State presents the question:

Whether in response to its inquiry the jury was properly instructed that to satisfy the specific intent requirement on the charge of assault with intent to maim, disfigure or disable, the intent need not be to disfigure or disable permanently?

It argues that the challenged instruction was proper, but we are not persuaded by its reasoning. The State cites to three cases of this Court which touched on § 386, *Dillsworth v. State*, 308 Md. 354, 519 A.2d 1269 (1987); *Robinson v. State*, 307 Md. 738, 517 A.2d 94 (1986); and *State v. Jenkins*, 307 Md. 501, 515 A.2d 465 (1986). It observes that our opinions in those cases did not "indicate any need to intend to injure the victim permanently." We agree that they did not. But neither did they indicate that the injury need be only temporary; the question was not before us in those cases, and we had no occasion to address it. The State also goes "[o]utside the context of mayhem and statutory maiming" and suggests that "the notion of 'disability' is common to the law and in no sense contemplates any form of permanent injury." It gives as examples that the statute of limitations for a person under a mental disability is stayed until such time as the disability is removed, and that a person "may receive workmen's compensation benefits for *temporary* total disability or *temporary* partial disability." The State concludes from those examples that "[t]here is simply nothing in the use of the term 'disable' to suggest the intent be to disable *perma-*

*nently."* The examples do not permit the quantum leap made by the State. Mental disability and disability under the workers' compensation law have absolutely nothing to do with disablement by maiming, and are of no significance whatever in divining the legislative intent as to § 386. The bottom line of the State's argument is: "Inasmuch as there is no requirement in Art. 27, § 386 that the intent be to maim or permanently disfigure or permanently disable, the trial court correctly instructed the jury in response to the jury's inquiry." Of course, the plain language of the statute declares that it is a crime to assault a person "with intent to maim." With respect to the intent to "disfigure" and "disable," the State disregards the context in which those words are used and their affinity to §§ 384 and 385, which deal with mayhem. Most importantly, the State simply avoids any discussion of the steadfast recognition, harking back to the first violent deprivation of the use of those members as may render a person less able in fighting, that the deprivation must be permanent.

We note that the State does not suggest the measure of "temporary." Would a day suffice, or a week, or must it be satisfied, even though not permanent, by a period of protracted or long duration? If the Legislature desired to depart from the common law concept of permanency inherent in §§ 384, 385 and 386, and adopt a view that a maiming, disfigurement, and disablement may be temporary, the meaning of temporary would be a matter for it to announce. If "temporary" is not qualified (the State does not suggest that it be), it would be mayhem to disfigure a person by blackening his eye or to disable him by spraining his finger, both injuries ordinarily being temporary in nature. We cannot imagine that the Legislature intended such an absurd result, for all along, it has obviously been of the view that its mayhem statutes proscribe serious offenses. Hammond is entitled to a new trial.

JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED; CASE REMANDED

**466**

FOR A NEW TRIAL; COSTS TO BE PAID BY ANNE ARUNDEL COUNTY.