THE STATE v. GEORGE MARTIN, Appellant.—119 S. W. (2d) 298.

Division Two, August 17, 1938.

*Randolph & Randolph* and *Nile L. Vermillion* for appellant.

*Roy McKittrick,* Attorney General, and *Frank W. Hayes,* Assistant Attorney General, for respondent.

ELLISON, J.—This case comes to the writer on reassignment. An opinion was written by COOLEY, C., which failed of adoption by the court on a divided vote on a question of law. We have concluded he was right in his conclusions and shall use his statement of the facts.

The appellant, George Martin, and Joe Arvin and Harold Johnson were charged by information in the Circuit Court of Buchanan County with felonious assault with intent to maim Lloyd DeCasnett. A severance was granted and appellant Martin, whom we shall call defendant, was tried alone. He was convicted, sentenced to two years' imprisonment in the penitentiary and has appealed. Among numerous other assignments of error he claims that the evidence did not justify submission of the case to the jury.

The information is based upon Section 4014, Revised Statutes 1929 (Mo. Stat. Ann., p. 2817), making it a felony for any person to shoot at or stab another or "assault or beat another with a deadly weapon, or by any other means or force likely to produce death or great bodily harm, with intent to kill, maim, ravish or rob such person. . . ." It charges an assault by defendant and Joe Arvin and Harold Johnson upon Lloyd DeCasnett "with a certain dangerous and deadly substance likely to produce death or great bodily harm, to-wit: a certain glass bulb, then and there containing sulphuric acid," with intent to maim said DeCasnett.

The State's evidence tends to show the following: the occurrence complained of happened in St. Joseph, Missouri, on the night of June 6, 1936, at apparently between 12 o'clock midnight and 12:30 A. M. of June 7th. DeCasnett, the alleged assaulted person, was in the employ of the Terminal Cab Company of St. Joseph but was not then on duty, as he worked during the day. That night he, with a young woman companion, a Miss Main, visited at the home of a mutual friend. Desiring to go home they called a Terminal Cab Company cab, which came, driven by one Stoneburner, an employee of the cab company. DeCasnett and his woman friend got in the back seat of the cab, DeCasnett on the right side, the driver, Stoneburner, being on the front seat behind the wheel. The night was warm and the windows of the cab were open. While the occupants of the cab were in those respective positions the cab, going northward on Eighth Street,

a north and south street, some sixty or so feet north of the intersec-
tion of that street with Seneca Street, an east and west street, met a
Chevrolet four door sedan car, going south on Eighth Street, in which
were three men.  The occupants of the cab did not recognize the men
in the Chevrolet.  According to the testimony of the occupants of the
cab something struck the side of the left front door of the cab, (it
appears to have been a four door vehicle) about six inches above the
lower hinge, when the two vehicles were ''just opposite each other''
and some eight or ten feet apart, going in opposite directions, at a
moderate rate of speed, say fifteen to twenty to twenty-five miles an
hour.  No one in the cab saw the object, whatever it was, thrown, nor
did any other witness see it thrown.  It is the State's theory that it
was—must have been—thrown by one of the three men in the Chevro-
let car.  It later proved, according to the State's evidence, to have been
a glass light bulb filled with sulphuric acid.

Stoneburner turned his cab and attempted to overtake the Chevro-
let, but, owing to a governor on his engine which limited his speed,
was unable to do so.  He, however, got the license number of the
Chevrolet, 203-087.  Being unable to overtake the Chevrolet he ''cut
across'' to Ninth Street, thinking the Chevrolet might come back
south on that street, which he says it did.  He there tried to ''crash
into it'' and stop it, but failed.  At that point Miss Main observed
the license number of the Chevrolet.  Stoneburner then went to the
police station and reported what had happened.

Very soon thereafter a Chevrolet four door sedan, bearing license
number 203-087 was found parked near what is called the Labor
Temple in St. Joseph, where defendant and the other two, Arvin and
Johnson, frequently sojourned and apparently had headquarters.
Defendant and Arvin were arrested there or thereabout that night.
Johnson was arrested very soon thereafter.  All were questioned
by the police.  All denied having been on Eighth Street that night or
having any knowledge of or participation in the acid throwing inci-
dent. It is admitted that the Chevrolet car bearing license number 203-
087 belonged to defendant and was in his exclusive possession and
driven by him on the night in question and that he, Arvin and John-
son were in said car on Ninth Street that night but all three denied
that they were on Eighth Street or nearer than one block to the in-
tersection of Eighth and Seneca.

Evidence on behalf of the State tends to show that spots were found
on the windshield of the Chevrolet car and a small piece of glass ad-
hering to the left side of its hood, also one or two burned spots on the
upholstery of the rear seat of said car, which, on laboratory tests
made by the city chemist, Dr. Baird, indicated, in the opinion of the
latter, sulphuric acid.  Also, it appears that some of the substance
contained in the object thrown against the cab had ''seeped through''
the crack or ''crease'' between the back of the door and the body of

the cab and had burned the adjacent upholstery.  Dr. Baird, thought, from his laboratory tests, that such burns indicated sulphuric acid. No part of the acid bulb nor any of its contents touched DeCasnett nor other occupants of the cab.  Marks on the cab and on said upholstery thereof indicated, according to the laboratory tests above referred to, the action of sulphuric acid.

Countering the last above mentioned evidence defendant, corroborated by three other witnesses, testified that a day or so before June 6th he had made a trip to Hannibal, Missouri, in his car, on which trip he had run through a swarm of bees, many of which had struck and been crushed on his car and its windshield.  He introduced evidence of an expert chemist to the effect that honey and the juices of bees might produce chemical reactions in laboratory tests similar to those described by Dr. Baird.  This expert evidence on both sides occupied much space in the record.  It is sufficient for the purpose of this case to say that, in our opinion, the question of whether or not the marks and indications found on the Chevrolet car and on the cab indicated sulphuric acid burns was for the jury.

It was also shown that when defendant's car was taken possession of by officers on the night in question in front of the Labor Temple there were found in the ''glove compartment'' thereof a revolver and two ''black jacks.''  These were introduced in evidence, over defendant's objections.  Defendant, by his testimony, corroborated by other witnesses, explained the presence of those articles in a manner consistent with his innocence.

It is inferable from the evidence that at the time in question there was a good deal of feeling in St. Joseph because of labor organization troubles, and that there had been complaints of acid throwing and perhaps other outrages supposed to have been committed by organizers of or persons interested in the organization and unionization of labor.  The evidence indicates that the employees of the Terminal Cab Company did not belong to a labor union; that defendant had been a member of organized labor for some eighteen years and for a number of years had been business agent for a ''Plasterers' and Cement Finishers' Union'' and the ''Builder's Common Laborers' Local 579,'' and that he had attempted to ''organize'' the employees of the Terminal Cab Company.  The evidence does not indicate that there had been any acrimony in the conversations he had had with the representative of the cab company with whom he had talked, nor that he had had conferences with employees of the cab company, unless the latter conclusion can be inferred from testimony that he had attempted to ''organize'' the cab company. There is no evidence that defendant or Arvin or Johnson personally knew DeCasnett, or even knew that he worked for the Terminal Cab Company, or that DeCasnett knew any of them, no evidence of ill will between any of those three and DeCasnett, and no evidence that

defendant or either of the other two in the Chevrolet car knew or could have known that DeCasnett was in the cab at the time the acid is claimed to have been thrown.

The point upon which the case was decided in the former opinion was this. It will be remembered the State's evidence showed that shortly after midnight someone in the Chevrolet sedan owned and driven by appellant threw an electric light bulb filled with sulphuric acid against the *left* front door of the Terminal Taxicab about six inches above the lower hinge, as the two cars passed at moderate city driving speed about 8 or 10 feet apart. The windows of the taxicab were open. The prosecuting witness, DeCasnett, was riding on the *right* side and Miss Main on the left side of the back seat, and the driver, Stoneburner, on the left side of the front seat. There was nothing in the evidence to show the assailants knew DeCasnett was in the car. The acid splattered over the taxicab and some of it reached the upholstery inside, but none of the occupants was burned. The opinion held these facts failed to make a case for the jury under Sec. 4014, R. S. Mo. 1929, Mo. Stat. Ann., p. 2817, on authority of State v. Mulhall, 199 Mo. 202, 214, 97 S. W. 583, 586, 7 L. R. A. (N. S.) 630, 8 Ann. Cas. 781; State v. Williamson, 203 Mo. 591, 102 S. W. 519, 120 Am. St. Rep. 678; and State v. Kester (Mo.), 201 S. W. 62, 64.

In the Mulhall case the defendant shot with a pistol at R but missed him and hit but did not kill M who was four or five steps away and not in line with the intended victim. The accused was prosecuted for assaulting M with intent to kill. It was ruled the statute requires a charge and proof that the accused assaulted a particular person with specific intent to kill, maim, ravish or rob *that* person; and hence the decision was that a prosecution under the statute would not lie for shooting M by mistake when the assault and felonious intent were directed at R. The gravamen of the offense, says this Mulhall case, is the felonious intent against the person assailed; and doubtless if the information had charged an assault with intent to kill R, the person shot at but missed, instead of M, the person wounded but against whom the accused had no felonious intent, the result should have been different.

In the Williamson case, likewise, the defendant shot at one person and hit another, Dorn. The opinion held the evidence was insufficient to make a case under the statute, saying, "it is clear from the evidence that the defendant did not intend to shoot Dorn, for there is no evidence that he even saw him at the time he fired the shot." In the Kester case the defendant shot from the highway into a darkened dwelling house at night wounding the housewife. There was no evidence that he could have seen her, and the conviction was reversed, FARIS, J., concurring in the result with expressed reluctance.

In State v. Wansong, 271 Mo. 50, 61, 195 S. W. 999, 1003, strikers

were prosecuted for assaulting with intent to kill a milk wagon driver whom they had set up in the dark. Their defense was that they had no felonious intent against *him*, but thought he was another man against whom they had a grudge. This was held to be no defense since they did intend to assault the identical person they assailed, though mistaken as to his identity. There was a similar holding in State v. Layton, 332 Mo. 216, 58 S. W. (2d) 454, where the defendant heard a noise behind a closed door and shot, wounding one person whom he believed to be another.

The instant case presents facts different from those in the decisions reviewed above, but the same principle applies. If a man throws a splattering acid bulb or an explosive bomb, or fires a scattering shotgun charge, at a group of persons all within range, he would be liable to prosecution under Section 4014, supra, for felonious assault upon any one of them, and he could not go acquit as to one by saying he harbored a felonious intent only against another of the group. The reasonable and probable consequences of the act being to injure the whole group, he could no more escape them by such a denial than he might by deliberately shooting at one person and disclaiming a felonious intent against that person. While the law in such cases requires a specific intent, it does not require malice in fact in the sense of actual spite or ill will against the person alleged to have been the object of the attack.

On the other hand, the intent will not be imputed, in the sense of being transferred or transposed from the person aimed at and missed to a person out of range and mistakenly hit. If A shoots at B and the bullet wounds C whose presence is unknown all the cases hold there can be no conviction under Section 4014, supra. Neither will the intent be transferred from those known to be in a group to others of whose presence the accused is ignorant. We do not mean that he must know of each individual in the group. If he knows the probable consequence of the assault will be to injure any one or all of the persons he sees or otherwise is bound to believe are before him, he will be liable as to any one of them. But if, without his knowledge there be still another person present concealed, as behind a bush or wall for illustration, he would not be liable as to that person for he could have no specific intent as to him. This, we conceive, is the crucial distinction in this case.

The statement of facts set out above says there was nothing in the evidence to show the assailants knew the prosecuting witness DeCasnett was in the taxicab. We have reexamined the record on that point. The driver, Stoneburner, and Miss Main were on the left side of the front and rear seats, respectively. This was the side next to appellant's automobile as the two cars passed, and presumably the acid throwers saw them. DeCasnett was on the right side of the rear seat, away from appellant. It was past midnight. There is testi-

mony that Eighth Street was "pretty well lighted" right at the intersection with Seneca Street. There is no evidence as to the height and brilliance of the street lights, but some ambiguous testimony developed by appellant's counsel on cross-examination that there were two lights, one on the southeast corner and one on the northwest corner. The taxicab had made a U turn at this intersection before the acid throwing occurred. Miss Main thought it had just got straightened out and was heading back north on Eighth Street at the time. DeCasnett and Stoneburner variously estimated it was from 60 to 100 feet north of the north curb of the intersection, the latter saying it was by a telephone pole about one-third way up the block. At any rate the nearest street light at the northwest corner of the intersection was behind and on the side of the street away from DeCasnett, and the light on his side of the car at the southeast corner of the intersection was further away and almost directly behind him.

There is nothing in the evidence warranting an inference that the assailants could have seen or known DeCasnett or any third party was in the taxicab, unless it be this: that all three occupants of the taxicab did see three men in the appellant's car as it passed. Two were on the driver's seat and one on the middle of the rear seat leaning over on the back of the front seat. The taxicab occupants were unable to identify them but Miss Main said they were young—younger looking than appellant. But it does not follow that because the occupants of the taxicab saw the men in appellant's car the latter also could have seen DeCasnett in the taxicab. They were in different positions. The men in appellant's car were well up in front, two on the driver's seat and one leaning on it between them. DeCasnett was on the right side of the rear seat of the taxicab with Stoneburner in front of him and Miss Main on his left side between him and the acid throwers. Whether they could see him depended on the lighting, his posture, the color of his clothing, etc. These facts were not developed.

Some of the testimony showed what the occupants of the taxicab were able to see on Ninth Street. Stoneburner, the driver, testified he noticed a man on the front seat of appellant's car "had on a kind of gray suit; when he went past the headlights he threw his arm up over his face." This incident evidently occurred on Ninth Street, because appellant's car did not pass the headlights of the taxicab on Eighth Street where the acid was thrown; it was later when the taxicab cut across Seneca Street and intercepted the appellant's car at right angles on Ninth Street. There was testimony that Ninth Street had boulevard light standards on the curb all the way up town. And the appellant, while denying that he had driven on Eighth Street at all that night, admitted in a written statement to the police that a little past midnight as he was driving north on Ninth Street between Olive and Lafayette Streets "a Terminal taxicab drove up

along side of my car and said something and started up 9th Street. In this cab were the driver, a woman and a man in the back seat.'' Assuming this was the taxicab in which DeCasnett was riding (though the State's evidence mentions no such incident) yet it was after the acid was thrown and on a different street; the lighting was better; and the taxicab mentioned in the statement drove up along side of appellant's car, going in the same direction, and someone in the taxi said something. Certainly this does not tend to prove the assailants could have seen everyone in the taxicab as the two cars passed on Eighth Street when the assault was committed. It would be pure speculation and conjecture to say on this record that the appellant and his confederates knew or had reason to believe DeCasnett or any other third party was in the cab.

This being true, if the cases reviewed above are to be followed, there was a failure of proof. Judge FARIS in his concurring opinion in State v. Kester, supra, 201 S. W. l. c. 64, expressed the view that the rule under the statute ought to be the same as it was at common law in homicide cases—that a constructive intent follows the bullet. Whether that be so or not when injury results, it cannot be the law in a case like this where no one was hurt, and the State's case rests solely on the overt act of throwing the acid bulb and the felonious intent to be deduced therefrom. We cannot go so far as to extend it to a person not known to be there. Perhaps the prosecutor had some good reason for charging an assault with felonious intent upon DeCasnett, instead of upon Stoneburner or Miss Main both of whom were more directly within view of their assailants. Stoneburner was the driver of the car, sitting by the left front door where the acid bulb hit. And the assailants must have known some person was driving the car even though they could not see him. The car would not run without a driver. Whatever the reasons were for designating DeCasnett as the object of the assault, they do not appear of record. We think the State did not make a case as to him for the reasons stated.

The crime was brutal and deserves commensurate punishment. It would seem to be impossible to throw a missle like an electric light bulb filled with acid from one automobile moving 15 to 25 miles per hour against another with open windows passing in the opposite direction at the same speed so as to hit above the lower door hinges of the latter, without great danger of serious injury to the occupants. In view of the facts and conclusions we have reached, the judgment is reversed and the cause remanded. All concur.