603 A.2d 883

**Maurice Edward FORD**

v.

**STATE of Maryland.**

**No. 465, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

April 1, 1992.

674

Julia Doyle Bernhardt, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both of Baltimore, and Alexander Williams, Jr., State's Atty. for Prince George's County of Upper Marlboro, on the brief), for appellee.

Argued before BLOOM, ROSALYN B. BELL and FISCHER, JJ.

ROSALYN B. BELL, Judge.

Appellant, Maurice Edward Ford, and two other youths went on a rampage, hurling rocks at automobiles traveling on the Capital Beltway (Interstate 95/495) at the Livingston Road overpass in Oxon Hill. Several people were injured and considerable property damage was done. The episode resulted in Ford being indicted on 90 separate counts. A jury in the Circuit Court for Prince George's County returned guilty verdicts on one count of assault with intent to maim, 11 counts of assault with intent to disable, six counts of assault, 17 counts of battery, 14 counts of malicious destruction of property in which the jury found the value of the property to be $300 or greater, and three counts of malicious destruction of property valued at less than $300. The court imposed prison sentences totaling 40 years (later

reduced to 39 years) with additional prison terms suspended in favor of five years probation to commence upon Ford's release from incarceration. In this appeal, Ford contends:

—the evidence was insufficient to sustain the convictions for assault with intent to maim and the convictions for assault with intent to disable;

—the evidence was insufficient to support certain battery convictions;

—the evidence was insufficient to prove a value of $300 or greater on count 85, malicious destruction of property belonging to Jose Torres;

—the trial court imposed illegal sentences for malicious destruction of property valued at $300 or greater; and

—his convictions were prohibited by double jeopardy principles.

We agree with Ford's fourth contention, but only on two counts. We find no reversible error with respect to the remaining contentions.

## THE FACTS

In the early morning hours between 2:00 and 3:00 a.m. of May 27, 1990, John Burgess, Donnell Petite, and Ford threw rocks at a number of vehicles driving south on the Capital Beltway and at least one vehicle which was traveling north on the Beltway.[1] Most of the vehicles that were hit pulled over to the side of the road. Witnesses estimated that anywhere from 15 to 40 vehicles were struck and then stopped. Patricia Jones's car was the first to stop and Jones estimated that the rock throwing continued from 30 to 45 minutes after she stopped.

Ford confessed to being one of the rock throwers. He admitted that he and the others gathered rocks from underneath a bridge and then brought the rocks to the Beltway;

---

1. Burgess and Petite were convicted in separate trials and their convictions have been affirmed by this Court.

other rocks were found on the side of the road. After throwing the rocks, the youths retrieved some of them from the Beltway so they could throw them again. Ford admitted that about 15 cars were struck. His explanation for his actions was that he was drunk; he maintained that he and his cohorts were not trying to hurt anyone.

After the rock throwing incident, 15 to 20 large rocks were observed in the southbound lanes and five to 10 rocks on the northbound side. The rocks had been used to landscape the underpass of the Beltway at Livingston Road.

Several witnesses stated that the rock throwers worked in concert. Byron Jeffrey's car was hit by two rocks. After passing the rock throwers, he observed in his rear-view mirror three figures who continued to throw rocks. Gregory Roddy observed three men waving their arms; he slowed down and one threw a rock, hitting his windshield. Blease Garner observed three men walking south. He observed one man throw a rock at another car. As Garner's car approached, another turned around and threw a rock at Garner's car. Garner stopped, got out of his car, and gave chase. The three men "started laughing" and ran into the woods.

Others saw only one man. For example, Robert Tillery was driving south when he saw a black male enter the highway from the median strip. Believing that the man was attempting to cross the road, Tillery changed lanes. Tillery related that the man took two steps and then threw a rock through his windshield. Jeanette George observed someone flagging her down. As she slowed, the man threw a rock through the windshield of her car.

The episode resulted in many personal injuries and extensive property damage. The most severely injured person was Destiny Morris, whose skull was fractured when she was struck in the head by a rock. The surgeon who tended to Morris shortly after the incident testified that Morris would have died if she had not received immediate medical attention. As a result of her injuries, Morris is expected to

function permanently on a third or fourth grade level. Morris was riding in James Palmer's truck when three men stepped onto the side of the highway and each threw a rock. All three rocks went through the windshield. One struck Morris in the head. John Miller, another passenger in Palmer's truck, received scratches from the breaking glass. The fourth passenger, Leanne Ekberg, received "little scrapes." Palmer's truck suffered damages totaling $4,000.

At trial, the witnesses testified to the results of the rock throwing incident. The windshield of Robert Tillery's car was broken, causing $500 damages. Elmer Moody's car, driven by Gloria Scott, also received a broken windshield. Kelley Moody, who was a passenger in the car, suffered a broken jaw and lost the hearing in her right ear.

Byron Jeffrey's car window was broken by a rock that hit passenger LaShonda Thompson, breaking her arm in three places. Damage to Jeffrey's car totaled $1,300. Jeffrey Baker's van was dented by a thrown rock, causing $680 in damages. The windshield of Julee Robinson's car was hit by a rock, resulting in damages amounting to $400.

Jeanette George was driving Rodney Marbury's car, which sustained a broken windshield and damages totaling from $1,200 to $1,400. Glass entered George's eye and cut her hand. Marbury was hit by a rock and lost consciousness. He was blinded in his right eye and suffered a broken wrist.

Nora Quintana received scratches on her face and hands when the windshield in David Powell's car exploded. Powell's shoulder was injured. Powell was unable to provide the total amount of damage to his car as the repairs were paid for by the insurance company, with the exception of a $500 deductible. Carolyn Smith Bryant received cuts on her hands and face and glass in her mouth when a rock hit a window of her car. Damages to Bryant's vehicle totaled over $1,000. Esther Humphrey's car, which sustained $1,100 in damages, was also hit by a rock. Michelle Bazilio,

a passenger in Humphrey's car, had her hand cut by flying glass.

The windshield of Steve Harrison's car, driven by his sister Amanda, was broken. Damages to the car totaled $125. Robert Brannigan's car was hit in the left rear passenger window. Tonia Wilkins's car also received a large dent on the left rear side, causing $338 total damages. Blease Garner's car was struck on the top of the roof, causing the windshield to shatter, resulting in $835 of damages. Gregory Roddy's car was struck in the windshield, causing $3,200 in damages. Robert Senkel's van was hit in the windshield by a rock, resulting in damages of $1,600. Frank Bailey's car, driven by his son Reginald, had a broken windshield. Reginald's forehead was cut and glass blew into his mouth. The left rear wheel of Kim Buchant's car was struck, causing $730 in damages. Jose Torres's car was hit on the driver's door, causing between $200 and $400 in damages.

## SUFFICIENCY OF THE EVIDENCE

■ Appellant's first three contentions assert that the evidence was insufficient as grounds for reversal on the convictions for assault, battery, and malicious destruction of property. In reviewing these claims, we are mindful that the test for sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *accord Wilson v. State*, 319 Md. 530, 535, 573 A.2d 831 (1990).

—Assault With Intent to Maim, Disfigure or Disable—

Appellant first argues that the evidence adduced at trial was insufficient to sustain his convictions for assault with intent to maim, disfigure or disable under Md.Code Ann.

Art. 27, § 386 (1957, 1992 Repl.Vol.).[2] Appellant cites the recent case of *Hammond v. State,* 322 Md. 451, 588 A.2d 345 (1991), and notes that in order to sustain a conviction under Art. 27, § 386, it must be shown that the defendant intended *permanently* to maim, disfigure or disable the victim. Appellant maintains that the evidence was insufficient to prove that he possessed the specific intent permanently to maim or disable as required by § 386 and *Hammond.* We disagree.

Both statutory maiming and assault with intent to disable are specific intent crimes. *Bryant v. State,* 83 Md.App. 237, 248, 574 A.2d 29 (1990). This Court has repeatedly held that evidence of an attack with a dangerous weapon on a victim is, in itself, sufficient to sustain a conviction for an assault with the intent to maim, disfigure, or disable. *See, e.g., Robinson v. State,* 66 Md.App. 246, 248–50, 503 A.2d 725 *cert. denied,* 306 Md. 289, 508 A.2d 489 (1986) (shooting in thigh sufficient to establish assault with intent to disable); *Biggs v. State,* 56 Md.App. 638, 652–53, 468 A.2d 669 *cert. denied,* 299 Md. 425, 474 A.2d 218 (1983) (shooting in lower back sufficient to establish assault with intent to maim). *See also Marks v. State,* 230 Md. 108,

---

**2.** Article 27, § 386, is titled, "Unlawful shooting, stabbing, assaulting, etc., with intent to maim disfigure or to prevent lawful apprehension." At the time appellant was charged, it stated in full:

"If any person shall unlawfully shoot at any person, or shall in any manner unlawfully and maliciously attempt to discharge any kind of loaded arms at any person, or shall unlawfully and maliciously stab, cut or wound any person, or shall assault or beat any person, with intent to maim, disfigure or disable such person, or with intent to prevent the lawful apprehension or detainer of any party for any offense for which the said party may be legally apprehended or detained, every such offender, and every person counselling, aiding or abetting such offender shall be guilty of a felony and, upon conviction thereof, be punished by confinement in the penitentiary for a period not less than eighteen months nor more than ten years."

The 1991 amendment substituted "are subject to imprisonment for not more than 15 years" for "thereof, be punished by confinement in the penitentiary for a period not less than eighteen months nor more than ten years." This amendment does not, however, change the results in this case.

112–13, 185 A.2d 909 (1962), *cert. denied* 373 U.S. 918, 83 S.Ct. 1308, 10 L.Ed.2d 417 (1963) (putting lit match to victim's shirt sufficient to establish assault with intent to maim).

Judge Moylan, writing for this Court in *Smith v. State,* 41 Md.App. 277, 305, 398 A.2d 426 (1979), said:

"A specific intent is not simply the intent to do the immediate act but embraces the requirement that the mind be conscious of a more remote purpose or design which shall eventuate from the doing of the immediate act. Though assault implies only the general intent to strike the blow, assault with intent to murder, rob, rape or maim requires a fully formed and conscious purpose that those further consequences shall flow from the doing of the immediate act. To break and enter requires a mere general intent but to commit burglary requires the additional specific intent of committing a felony after the entry has been made. A trespassory taking requires a mere general intent but larceny (or robbery) requires the specific *animus furandi* or deliberate purpose of depriving the owner permanently of the stolen goods."

Commentators have summarized the law of specific intent as follows:

"Where a specific intent is an essential ingredient of the crime charged, it must be alleged and proved by the prosecution.... The intent with which a harmful act is done is usually not expressed in words, and the jury is permitted to draw such inferences of intent as are warranted under all the circumstances of the particular case, but there is no presumption of law, either conclusive or disputable, that an act was done with any specific intent, unless some statute provides for such presumption in the trial of a particular offense."

Perkins & Boyce, *Criminal Law,* 854 (3d ed. 1982) (footnotes omitted).

In the instant case, Calvin Morrison testified that in the early morning hours of May 26, 1990, the day before the

rock throwing incident, he, appellant, and John Burgess were walking under the Beltway overpass at Livingston Road. Appellant picked up a rock, tossed it in his hand, and said, "Let's introduce Mad Ball [Morrison's nickname] to the bridge." Morrison testified that he and the others laughed, but no rocks were thrown at that time.

During the trial, several of the rocks were placed into evidence, thus affording the jury the opportunity to view their size. Byron Jeffrey testified that after his car was hit by two rocks he witnessed three figures in his rearview mirror who continued to throw rocks. Gregory Roddy observed three men standing on the left hand shoulder of the road, waving their arms as he approached. Roddy believed they might be in need of assistance, but, as he slowed down, his car was pummelled with rocks, smashing his windshield. Other witnesses testified that the assailants intentionally tried to slow down vehicles before unleashing an onslaught of rocks usually directed at the windshield.

It is reasonable to infer that one who hurls large rocks at the windshield of an automobile being driven on the highway intends permanently to disable the driver. Permanently disabling injuries to the driver would be a natural and foreseeable consequence that would flow from hurling large rocks at the windshield of a moving vehicle.[3]

There was, therefore, ample evidence from which the jury could find that appellant had the specific intent permanently to disable the one person known to occupy each vehicle, the driver. Accordingly, we shall affirm the judgments as to counts 7, 22, 24, 54, 60, 73 and 76, for assault with intent to disable James Palmer, Jeanette George, Reginald Bailey,

---

**3.** In addition, it is always permissible to infer that one intends the natural and foreseeable consequences of his or her conduct. *Glenn v. State,* 68 Md.App. 379, 409, 511 A.2d 1110, *cert. denied,* 307 Md. 599, 516 A.2d 569 (1986).

Bruce Tillery, Carolyn Bryant, David Powell, and Robert Senkel, respectively.

Appellant's contentions that there was insufficient evidence to support the convictions for assault upon Destiny Morris with intent to maim (count 2), or to disable (count 3), or assaults upon Rodney Marbury (count 19), LaShonda Thompson (count 31), or Kelly Moody (count 88) with intent to disable, present a different problem. Morris, Marbury, Thompson and Moody were passengers in vehicles that were the targets of rocks hurled by appellant and his cohorts.

In the instant case, the court invoked the so-called doctrine of transferred intent to justify its denial of appellant's motion for acquittal on the assault charges as they related to the passengers. In *State v. Wilson*, 313 Md. 600, 601 n. 1, 546 A.2d 1041 (1988), the Court of Appeals, quoting *Gladden v. State*, 273 Md. 383, 404, 330 A.2d 176 (1974), defined "transferred intent" as

> "the common law doctrine which states that 'the state of mind which one has when about to commit a crime upon one person is considered by law to exist and to be equally applicable although the intended act affects another person.'" (Citations omitted.)

The doctrine is most commonly applied to completed homicide cases and other general intent crimes.

The specific intent crime in *Wilson* was attempted murder. The language of the Court, however, indicated its intention to extend the doctrine of transferred intent to other specific intent crimes as well. The Court said:

> "Consequently, the doctrine's applicability, as recognized by this Court in *Gladden*, extends to all situations where a defendant's intended act (which in all other respects constitutes a crime) 'affects' or 'inflicts harm upon' an unintended victim. Moreover ... the doctrine's applicability is not limited to only general intent crimes. In fact, the very crime to which the doctrine was applied

in *Gladden* was first degree premeditated murder, unquestionably a specific intent crime."

*Wilson,* 313 Md. at 604, 546 A.2d 1041.

■ The *Wilson* Court noted, however, that there are cases in other jurisdictions that have refused to apply transferred intent to specific intent crimes. For example, in *State v. Martin,* 342 Mo. 1089, 119 S.W.2d 298 (1938), the Supreme Court of Missouri held that the specific intent required for assault with intent to maim will not be transferred from an intended victim to a person who is mistakenly hit. The Court of Appeals in *Wilson* distinguished *Martin* and other like decisions, however, as being "based upon construction of statutory provisions which require that the defendant's criminal intent be directed toward the person actually injured." *Wilson,* 313 Md. at 606, 546 A.2d 1041.

Thus, there is a distinction between specific intent crimes. The first type of specific intent crimes are those that require a specific intent to cause a specific type of harm, as in *Wilson.* The second type are those which, by statutory definition, require a specific intent to cause a specific type of harm *to a specific person,* as in *Martin.* Attempted murder falls into the former classification, as does premeditated murder. In Maryland, so also does assault with intent to murder, for as the *Wilson* Court pointed out, "Maryland's statute setting forth the penalty for the crime of assault with intent to murder, Md.Code Ann. Art. 27, § 12 (1957, 1987 Repl.Vol.), while requiring a specific intent to kill, includes no language requiring an intent to kill a specific victim." *Wilson,* 313 Md. at 607, n. 4, 546 A.2d 1041. Assault with intent to maim, disfigure, or disable, under Md.Code Ann. Art. 27, § 386 (1957, 1987 Repl.Vol.), is within the latter classification, since it requires a specific intent to cause a specific type of harm to a specific person, namely, the person assaulted or beaten.

*Wilson* makes clear that, in the first category of specific intent crimes, those requiring merely a specific intent to cause somebody a particular type of harm, intent may

transfer from the intended victim to the actual victim. *Wilson* recognizes and, we believe, distinguishes the second category of specific intent crimes, those which by statutory definition require an intent to harm a specific person. In this second category, intent cannot transfer from the intended victim to anyone else who happens to be injured by the criminal act—in the instant case, from the driver to the passenger in the car. We conclude, therefore, that the trial court erred in applying the doctrine of transferred intent to the offense of assault with intent to maim, disfigure, or disable.

> "The crime of 'assault with intent . . . to inflict great bodily harm' cannot, it seems clear, be committed by a battery of the criminal negligence type. It is not enough for such a crime that the defendant's conduct created a high degree of risk . . . of great bodily harm; he must actually intend to cause the specific result required by the statute. . . . On similar principles, an assault 'with intent to maim' requires a specific intent to disfigure or dismember; it is not enough recklessly or unlawfully to cause such an injury."

2 W. LaFave & A. Scott, *Substantive Criminal Law* 307–08 (1986) (footnote omitted).

■ There is, however, enough evidence from which a rational inference can be drawn that appellant possessed the requisite specific intent to maim or disable Destiny Morris, Rodney Marbury, LaShonda Thompson, and Kelly Moody, the passengers in four of the cars. As discussed previously, the injuries to the drivers of the cars were consequences known to the perpetrators that flowed from the hurling of the rocks at the windshields of the cars. Injury to the passengers in the cars is also a logical and intended consequence of the rock throwing incident. When the rocks were thrown at the windshield of the vehicles, it is permissible to infer that the one throwing the rocks did so with the intent to injure whoever was inside.

As a general matter, when one hurls a rock at the windshield or window of a moving vehicle, it is permissible

to infer that the rock thrower intends the natural and probable consequence of his or her act. In other words, it was permissible for the jury to infer that appellant intended that the rock would cause injury to any person in the car. This is in keeping with the cases previously cited where the evidence of an attack with a dangerous weapon was sufficient to sustain a conviction for assault with intent to maim, disfigure or disable.

In *Robinson*, 66 Md.App. at 248–49, 503 A.2d 725, this Court held that the physical circumstances surrounding the shooting of a medical school professor by his estranged lover, buttressed by other surrounding circumstances, clearly established a *prima facie* case of assault with intent to disable. In the instant case, therefore, the circumstances support appellant's convictions as they relate to the passengers in the vehicles. From physical and other surrounding circumstances of the instant case, it is permissible to infer that appellant had the requisite specific intent to assault Morris, Marbury, Thompson and Moody.

During trial, James Palmer, who was the driver of the pickup truck in which Destiny Morris was riding, testified that he witnessed three individuals step onto the side of the highway and throw rocks at vehicles on the road. Palmer was able to relate that each of the three individuals threw a rock which struck his truck. In addition, he was able to describe the color of the clothing worn by each one of the individuals who threw the rocks. Palmer testified that the three "stepped from the median over the guardrail on to the side of the highway." Palmer described them as being in a line and remaining in the line as they moved onto the highway. Palmer stated that he was approximately 25 feet from the individuals when he observed them move onto the side of the highway.

Palmer's ability to describe both the movements and the clothing of the three individuals could lead to a rational inference that appellant knew that there were others in the pickup truck when he threw the rock that struck Destiny Morris. Palmer stated during his testimony that the traffic

pattern at that particular point "ranked from 2 vehicles to 10 vehicles going down the highway in a bunch." Five vehicles including Palmer's were together when the rock hit Palmer's truck.[4] Given the number of cars traveling together with headlights on and the close proximity of the individuals throwing the rocks to the truck, the jury could have found that appellant knew there were passengers in the Palmer truck. Thus, there was ample evidence from which the jury could find that appellant had the specific intent permanently to disable the passenger or passengers, as well as the driver. Accordingly, we shall affirm the judgment as to counts 2 and 3 for assault with intent to maim or disable Destiny Morris.

There was also ample evidence from which the jury could find that appellant had the specific intent to disable Rodney Marbury. Marbury was a passenger in the car driven by Jeanette George. Marbury testified that, as he and George were traveling on the Beltway, they noticed that there were "a lot of cars stopped on either side of the road." At the time, Marbury "thought there was an accident or something." Marbury next noticed someone step out into the road, waving his hand. Marbury testified that the person was waving like he needed help and wanted Marbury and George to slow down and assist. Marbury was then struck with a brick. He lost the sight in his right eye and suffered a broken wrist. George testified that the person who flagged the car down was the same one who threw the brick. George also was able to describe the color clothing that the individual was wearing and that he was short with a slim build. With the speed of the car slowed and the nearness to the car of the person who eventually threw the

---

4. Palmer's description of the number of cars he was travelling with is in keeping with the available statistical data concerning use of that particular portion of the Beltway. According to the Traffic Forecasting Office of the Division of Project Planning for the Maryland Department of Transportation, on any given night, at the time the rock throwing incident occurred, approximately 1,000 cars use that stretch of the Beltway. This translates to roughly 16 cars per minute.

brick, the jury could have made a rational inference that the specific intent permanently to disable Marbury existed, since appellant was close enough to see that a passenger was in the car driven by George.

A similar conclusion can be reached with respect to the injuries sustained by LaShonda Thompson (count 31). Thompson was a passenger in a vehicle driven by her cousin, Byron Jeffrey. In response to questioning from the Assistant State's Attorney, Thompson testified as follows:

> "When my cousin and I were on the way home three young men were standing on the side of the Beltway and as we approached one of the young men threw a large rock through the windshield on the passenger side of the vehicle."

Thompson also testified that the person who threw the rock waited to throw it until the vehicle she was riding in was close enough to hit. Thompson's testimony that the rock was thrown when the vehicle was close to the three individuals and that the rock was thrown at the passenger side of the vehicle supports a rational inference that there was a specific intent to disable the passenger, LaShonda Thompson, in the Jeffrey vehicle. Thus, we affirm count 31.

The injury to Kelly Moody (count 88), who was a passenger in the car driven by Gloria Scott, requires a slightly different analysis, yet it yields the same result. Neither Moody nor Scott was able to relate at trial any of the details surrounding the throwing of the rock that fractured Moody's jaw, caused her to have heart problems, and lose the hearing in her right ear.

There is no evidence in the record as to what order the vehicles were struck. Thus, it is impossible to tell precisely when during the rock throwing incident Moody was struck. Testimony from other witnesses, however, could have led the jury to conclude that appellant and the others were close enough to the vehicles to determine that some of the cars contained a passenger. For example, Nathan Bryant, whose vehicle was also struck, testified:

"A guy came off the side of the railing, had a red jacket on, tall, slim guy. He was laughing and he cocked back his hands and threw a rock...."

Thus, the person throwing the rock was close enough so that, even in the dark, Bryant could see that he was smiling. Other victims testified that they heard the persons throwing the rocks laughing. In addition, there was testimony to the fact that the perpetrators stepped out onto the highway before they threw the rocks, waiting until the cars were close enough so that they could deliver an effective hit. Also, as stated previously, there were enough cars traveling together to have illuminated the highway area.

In light of this testimony, it is rational to infer that appellant knew that there was a passenger in the car before the rock that injured Moody was thrown. Thus, we also affirm count 88, assault with intent to disable Kelly Moody.

### —Battery Convictions—

Appellant next argues that the evidence was insufficient to support the convictions of battery as to Blease Garner, Reginald Bailey, Michelle Bazilio, Jeanette George, Norma Bennett, James Palmer, Nathan Bryant, Pongee Johnson, and Robert Tillery. We disagree.

The most common definition of battery is the unlawful touching of another. This Court has also stated that battery "consists of the unpermitted application of trauma by one person upon the body of another person." *McQuiggan v. Boy Scouts of America*, 73 Md.App. 705, 714, 536 A.2d 137 (1988).

 Appellant was convicted of assault, not battery, as to Blease Garner and Pongee Johnson. Therefore, there is no reason to address the argument that the evidence was insufficient to support appellant's conviction of battery as to those victims. The evidence, as it relates to the convictions of appellant for battery of Reginald Bailey, Michele Bazilio and Jeanette George, conclusively shows that all three of these victims were "touched" by appellant. As

previously mentioned, Reginald Bailey was cut and received glass in his mouth from a rock thrown at his windshield, Michelle Bazilio received a cut hand, and Jeanette George had glass in her eye and her hand was cut. The evidence was more than sufficient to support these battery convictions.

James Palmer was driving his 1988 Ford truck in which Norma Bennett, Destiny Morris and others were passengers. The evidence showed that three rocks hit Palmer's truck. The State's Attorney, while questioning James Palmer about the rocks, elicited these statements:

"Q. Where did they hit?

"A. One hit over top of my head all the way to the top of the windshield; one hit the hood of the truck and went through the bottom center portion of the windshield and the other hit high on the passenger side all the way to the top of the windshield.

\* \* \* \* \* \*

"Q. Now, what—where did these rocks land? Do you recall?

"A. One hit the back of the top of the roof on the inside behind myself and landed on the seat. The one that struck Destiny went out the back window and the one that went over John and Leanne's head out the passenger side went out the back window."

Similarly, Robert Tillery's car had a rock thrown right through the windshield. A piece of glass blew into Tillery's eye as he proceeded down the road after the incident.

Reiterating the standard for appellate review of sufficiency of evidence arguments, we find the test is "whether the evidence shows directly or supports a rational inference of the facts to be proved, from which the trier of fact could fairly be convinced, beyond a reasonable doubt, of the defendant's guilt of the offense charged." *Wilson*, 319 Md. at 535–36, 573 A.2d 831. Based on the destruction and shattering of Palmer's and Tillery's windshields, could this jury or any rational trier of fact decide beyond a reasonable

doubt that these three victims were "touched" as a result of the rocks thrown, either by the projectiles themselves, or by flying glass put in motion by the projectiles? We cannot say that the evidence was insufficient for such an inference.

### —Malicious Destruction of Property—

■ Appellant also argues that the evidence was insufficient to prove a value of $300 or greater on count 85, malicious destruction of property belonging to Jose Torres. We agree with the State that appellant has failed to preserve this issue for appeal. Rule 4–324(a) provides:

> "*Generally.*—A defendant may move for judgment of acquittal on one or more counts, or on one or more degrees of an offense which by law is divided into degrees, at the close of the evidence offered by the State and, in a jury trial, at the close of all the evidence. *The defendant shall state with particularity all reasons why the motion should be granted.* No objection to the motion for judgment of acquittal shall be necessary. A defendant does not waive the right to make the motion by introducing evidence during the presentation of the State's case. (Emphasis added).

As the Court of Appeals has stated, "[t]he language of the rule is mandatory." *State v. Lyles*, 308 Md. 129, 135, 517 A.2d 761 (1986). *Accord, Fraidin v. State*, 85 Md.App. 231, 244–45, 583 A.2d 1065, *cert. denied*, 322 Md. 614, 589 A.2d 57 (1991). Accordingly, since the record indicates that appellant did not state with particularity *any* reason why his motion for judgment of acquittal on count 85 should be granted, the issue has not been preserved for our review. Rule 8–131(a).

## SENTENCES FOR MALICIOUS DESTRUCTION

■ Appellant maintains that the trial court imposed illegal sentences for each conviction of malicious destruction of property valued at $300 or greater. The State concedes, and we agree, that the sentences for count 81, destruction of the property of Robert Brannigan, and count

90, destruction of the property of E. Daniel Moody, were illegal. As to both of these counts, the jury found appellant guilty of malicious destruction of property having a value of less than $300. The trial judge, however, sentenced appellant to three years for each count in violation of Md.Code Ann. Art. 27, § 111(b) (1957, 1992 Repl.Vol.), which allows for "a fine not exceeding $500 or imprisonment not exceeding 60 days or both" for destruction of property where the value is less than $300. Therefore, we shall vacate those sentences and remand for resentencing as to counts 81 and 90.

The remaining convictions for malicious destruction of property valued greater than $300, appellant argues, are also illegal. In support of this contention, appellant cites *Spratt v. State*, 315 Md. 680, 556 A.2d 667 (1989), and argues that the sentences are illegal because the State did not *specifically charge* appellant with malicious destruction of property valued greater than $300.

In *Spratt*, 315 Md. at 686, 556 A.2d 667, the State did specifically charge Spratt with "malicious destruction of property valued greater than $300.00 dollars." Spratt was convicted of the charge in the Circuit Court for Cecil County. This Court affirmed Spratt's conviction in an unreported opinion. The Court of Appeals reversed, stating, "if the State wishes to pursue the more serious offense under subsection (c),[5] it must specifically charge and prove the value of the destroyed property, greater than $300.00 dollars." *Spratt*, 315 Md. at 686, 556 A.2d 667. In *Spratt*, the jury was not instructed, nor did it specifically find, that the destroyed property was of a value greater than $300. The Court of Appeals held that, "[b]ecause no jury finding was made regarding the value of the automobile destroyed, Spratt's conviction and three year sentence under the great-

---

5. Article 27, § 111(c) provides:
 "If the property defaced, destroyed, injured, or molested has a value of $300 or more, the person who violates this section, on conviction, is subject to a fine not exceeding $2,500 or imprisonment not exceeding 3 years or both."

er offense of malicious destruction of property, Art. 27, § 111(c), was improper." *Spratt,* 315 Md. at 690, 556 A.2d 667.

In the instant case, conversely, appellant was not specifically charged, as *Spratt* requires, but the jury was instructed and did specifically find, as to each count of malicious destruction, whether the property was of a value greater or lesser than $300.

The State argues, however, that appellant waived this issue. We agree.

Defects in an indictment, other than jurisdictional defects, are waived unless raised pursuant to Rule 4–252(a).[6] *State v. Chaney,* 304 Md. 21, 27, 497 A.2d 152 (1985), *cert. denied,* 474 U.S. 1067, 106 S.Ct. 824, 88 L.Ed.2d 796 (1986). Thus, if the complaint is that an indictment failed to give the accused notice, such claims are waived if no pretrial challenge is made. *Campbell v. State,* 86 Md. App. 158, 161, 586 A.2d 32, *cert. granted,* 323 Md. 115, 591 A.2d 506 (1991). Only when the indictment fails to charge a crime is the claim jurisdictional and assertible at any time. *Campbell,* 86 Md.App. at 161, 586 A.2d 32. The Court of Appeals in *Spratt,* 315 Md. at 683, 556 A.2d 667, noted that the General Assembly intended to treat the crime of malicious destruction of property as one offense, but with separate classifications. Therefore, even though the State should have specifically charged appellant with malicious

---

6. Rule 4–252(a) provides:
 "In the circuit court, the following matters shall be raised by motion in conformity with this Rule and if not so raised are waived unless the court, for good cause shown, orders otherwise:
 "(1) A defect in the institution of the prosecution;
 "(2) A defect in the charging document other than its failure to show jurisdiction in the court or its failure to charge an offense;
 "(3) An unlawful search, seizure, interception of wire or oral communication, or pretrial identification;
 "(4) An unlawfully obtained admission, statement, or confession;
 "(5) A motion for joint or separate trial of defendants or offenses."

destruction of property valued over $300, appellant has waived our review of the matter. Rule 4–252(a).

## DOUBLE JEOPARDY

Lastly, appellant argues that certain convictions are prohibited by the Double Jeopardy Clause of the Fifth Amendment and Maryland common law. We disagree.

Briefly stated, appellant claims that, because his motion for judgment of acquittal was granted as to certain counts relating to certain victims, it was inconsistent for the trial judge to allow other similar counts for different victims to go to the jury. Appellant relies on the collateral estoppel aspect of double jeopardy to make his case. He claims that, because the court granted his motion for judgment of acquittal as to assault with intent to disable three of the occupants of James Palmer's truck, the court necessarily determined that appellant lacked the specific intent to commit the crime. Therefore, the acquittal as to three of the occupants cannot be reconciled with the conviction of appellant for the same offense as to James Palmer and Destiny Morris, the other two occupants of Palmer's truck.

The collateral estoppel form of double jeopardy is well illustrated by the case of *Ashe v. Swenson*, 397 U.S. 436, 442, 90 S.Ct. 1189, 1193, 25 L.Ed.2d 469 (1970), which held that the federal rule of collateral estoppel in criminal cases is embodied in the Fifth Amendment's guarantee against double jeopardy. In *Ashe*, six men had been robbed, while playing poker, by four men armed with guns. The defendant was indicted and tried for robbery of one of the six victims. He was acquitted of the charge and subsequently indicted for robbery of another one of the victims. After an examination of the trial record, the Supreme Court reasoned that the original acquittal must have turned upon a finding that the defendant was not one of the four robbers. The Supreme Court held that collateral estoppel, by virtue of the Fifth Amendment, precluded retrial of that issue, which was ultimate in the first trial and integral to a

conviction in the subsequent trial. *Ashe,* 397 U.S. at 442–43, 90 S.Ct. at 1193–1194.

In the instant case, before granting appellant's motion for judgment of acquittal as to three of the occupants of Palmer's truck, the trial judge questioned the State's Attorney:

"My question to you is that, first of all, you have to go on the theory of transferred intent. Assuming that to be your theory, how many people are to be brought within the umbrella of transferred intent? My point is how many people are to be put into that same category that the transferred intent goes to them?

"I have no problem with the fact that I just by my telling you what counts I want you to address I have concluded that assuming that there is transferred intent it goes to Destiny Morris. I am asking you how far down that chain does it go. Does it go to Norma Bennett who was not injured at all? Does it go to John Miller who was not injured at all? That is my question, sir."

The State maintained that the doctrine extended to everyone in the vehicle, arguing that the fact that the victim was not injured was irrelevant and that the important consideration was the intent of the person throwing the rock. The court ruled:

"I know what the State's theory of this case is and it's one of the theories is that if there is more than one person in an automobile that the doctrine of transferred intent is alive and well, and they are applying it in this case, and they will attempt to apply it and attempt to have the jury understand that doctrine. Assuming that count gets to the jury, that will make that doctrine applicable.

"But with respect to Norma Bennett, Norma Bennett was in fact riding next to James Palmer. Now admittedly, the State may very well have a better argument with respect to transferred intent as to Norma Bennett than they would have to Leanne Ekberg, but the Court just finds that saying that the transferred intent goes to

everyone in the cab of that truck while in theory it may very well be so, in reality if a jury finds transferred intent, is the transferred intent there because the jury is punishing a defendant for being involved with something or is the transferred intent there because actually under the law the transferred intent is appropriate? And I don't know that that jury can make that fine distinction in the case, and I have to err on the side of caution with respect to those *type* of charges and the defendant before the Court, and *although the State has made out a prima facie case with respect to their evidence at this juncture*, I have a great concern about overreaching with respect to the doctrine of transferred intent and Miss Bennett, and I am going to take out things that I think will cause difficulty even later, and *taking out later is not going to change anything because the defendant's statement is already in this case.*" (Emphasis added.) Accordingly, the court granted the defense's motion as to the counts alleging aggravated assaults on Bennett, Ekberg, and Miller.

On appeal, the question is not whether the trial court acted correctly in its ruling on the motions. *See Wright v. State,* 307 Md. 552, 563, 515 A.2d 1157 (1986). It reached the right result, but for the wrong reason. That, however, is not relevant to the double jeopardy issue. The court's conclusion that a *prima facie* case had been made for all of the victims eliminates any argument that double jeopardy was implicated; there was no finding of ultimate fact adverse to the State as there was in *Ashe.*

Obviously, the court was attempting to put some limit on the transferred intent doctrine. As to Palmer, the driver, the doctrine of transferred intent did not apply; since all vehicles must have a driver, the court quite properly left it to the jury to decide guilt or innocence of the charge of assault on Palmer with intent to disable him, and double jeopardy concerns did not preclude appellant's conviction for that offense. Less logical was the court's distinguishing between Morris and the other passengers. Neverthe-

less, the reason given by the court for that distinction, concern that excessive application of the doctrine of transferred intent might lead to unjust results, negates the argument that acquittal by the court on some counts was on a factual basis that brought the doctrine of collateral estoppel into play.

Appellant posits an identical argument relating to the vehicle driven by Carolyn Bryant. The court denied a motion for judgment of acquittal for assault with intent to disable Bryant, the driver of the car, but granted the motion for acquittal relating to the passenger, Nathan Bryant.

These rulings were based on the same reasons as the rulings for the Palmer vehicle: conviction of an assault on all passengers under the transferred intent theory would be overreaching.

Each instance of rock throwing was a separate action by appellant, and, therefore, each separate action supported individualized consideration. For that reason alone, granting a motion for acquittal on some counts alleging attacks on other vehicles did not implicate at all the separate behavior and evidence necessary to support guilty verdicts on other counts. *Cf. State v. Boozer,* 304 Md. 98, 113, 497 A.2d 1129 (1985) (separate charges support separate convictions); *Holland v. State,* 77 Md.App. 252, 258–59, 549 A.2d 1178 (1988), *cert. denied,* 314 Md. 628, 552 A.2d 894 (1989) (in bench trial, separate acts of misconduct supported separate crimes against one person); *Partain v. State,* 63 Md.App. 260, 268, 492 A.2d 669, *cert. denied,* 304 Md. 299, 498 A.2d 1185 (1985) (not inconsistent for jury to conclude that the separate incidents of the same type of sexual activity constitute individual second and third degree sexual offenses).

Appellant points to the granting of his motion for judgment of acquittal as to two counts alleging assault and battery and maintains that, therefore, the other assault and battery convictions are not viable. The court granted the

defense's motion as to counts 50 and 53. Both of these counts were for the occupants of Patricia Jones's car.

■ At trial, Patricia Jones testified that, as she was driving south on the Beltway, accompanied by her daughter, Kim Mezacapa, at least two rocks came "flying out of nowhere." One hit the frame around the windshield and another went through the radiator in the front of the car and damaged the undercarriage. Jones saw no one. Jones stated that, when she pulled off the road, no one else had stopped; however, many cars stopped after she did. Mezacapa did not testify.

The court ruled that, because the Jones car was the first one hit by rocks, and she did not see who the perpetrators were, the jury could make one inference favorable to the defense and one favorable to the State. The court opined: "But in my courtroom ties go to the runner." The court said that, although other persons had identified the rock throwers by the colors they were wearing, those identifications were for actions occurring after the Jones incident. Thus, the court opined that the jury would have to speculate that the same rock throwers threw rocks at Jones's car. Accordingly, it granted the motion as to all of the counts concerning the attack on her car.

This reasoning, regardless of its validity as to the propriety for granting a motion for judgment of acquittal, distinguished the occupants of the Jones vehicle from any other victims in the case. There was no ruling on any ultimate fact adverse to the State that applied to any of the other counts.

■ At trial, the court granted the defense's motion for judgment of acquittal on two counts of destruction of property. The first was count 51, which concerned Patricia Jones's automobile. As just discussed, the court distinguished Jones's vehicle from the rest because it was the first vehicle struck. Based on that distinction, no ultimate fact concerning other destruction of property counts was adversely decided against the State. The second was count

84, which alleged the destruction of property of Tonia Wilkins. At trial, Wilkins stated that, as she was driving south on the Beltway, she heard a "big thump on my side of the car." She kept driving and "didn't think it was anything big until I got home ." The next morning, she noticed dents on the driver's side of her car. She did not observe any perpetrators.

In argument, defense counsel maintained that Wilkins "did not observe anything, kept driving, no identification whatsoever...." The court granted the motion without specifically explaining its reasons. Again, however, the granting of the motion followed the court's long explanation that it was going to remove certain counts because it did not want the jury to overreach. This was not an adverse finding of any fact common to counts involving other vehicles or other victims. Moreover, as to Wilkins's vehicle, the evidence was weaker than any of the other rock throwing incidents. Wilkins only heard a sound; she never saw what caused the dent, she did not stop, she did not determine that there was a dent until the next morning, and there was no evidence showing where on the Beltway the incident occurred. Accordingly, based on the argument of counsel, the court's ruling was fairly premised on its unwillingness to let the jury overreach; it was not based on any conclusion that appellant was not a rock thrower. Indeed, as to this count and to the other double jeopardy allegations, the court's comments that, "I am going to take out things that I think will cause difficulty even later, and taking out later is not going to change anything because the defendant's statement is already in this case," demonstrates that the court believed that there was sufficient evidence of guilt, particularly given appellant's admission that he threw rocks.

Finally, whether the trial court properly ruled that the evidence as to the Wilkins and Jones incidents was insufficient to go to the jury, the factual situations of those two property owners are distinguishable from the facts supporting conviction on the other counts of destruction of proper-

ty. Each incident was separate, supported by different evidence of guilt. Accordingly, there is no merit to appellant's claims.

SENTENCES ON COUNTS 81 AND 90 VACATED AND CASE REMANDED FOR RESENTENCING ON THOSE COUNTS.

ALL JUDGMENTS OTHERWISE AFFIRMED.

COSTS TO BE PAID FOUR–FIFTHS BY APPELLANT AND ONE–FIFTH BY PRINCE GEORGE'S COUNTY.

BLOOM, J., concurs in part and dissents in part.

BLOOM, Judge, concurring in part and dissenting in part.

I concur with most of the majority opinion. I agree with the affirmance of all of the convictions for battery and malicious destruction of property. I agree that the sentences on Counts 81 and 90, for malicious destruction of property having a value of less than $300, exceeded the statutory maximum and must be vacated for that reason. I agree also with the ruling on appellant's double jeopardy contention. And finally, I agree with the affirmance of the convictions on Counts 7, 22, 24, 54, 60, 73, and 76, for assault with intent to disable James Palmer, Jeanette George, Reginald Bailey, Bruce Tillery, Carolyn Bryant, David Powell, and Robert Senkel, respectively.

I part company with the majority, however, with respect to its affirmances on Count 2, for assault with intent to maim Destiny Morris, and on Counts 3, 19, 31, and 88, for assaults with intent to disable Destiny Morris, Rodney Marbury, LaShonda Thompson, and Kelly Moody, respectively.

The trial judge denied appellant's motion for judgment of acquittal as to those counts and let them go to the jury on the theory that the doctrine of transferred intent applied. As the majority opinion correctly points out, the doctrine of transferred intent does not apply to the statutory offenses of assault with intent to maim or disable, which requires a

specific intent to cause a particular type of harm to a specific person—the one assaulted.

The trial judge's conclusion that the doctrine of transferred intent furnished an adequate basis for denial of appellant's motion for acquittal was, therefore, erroneous. That does not dispose of the issue, however. If there were any evidence from which the jury could find the existence of the requisite specific intent, the ruling—denial of appellant's motion for acquittal—would be correct even if the stated reason for the ruling were wrong.

What then was the evidence disclosing the state of mind of appellant or any other of the youths who hurled rocks at motor vehicles traveling along the interstate highway? It was nighttime—between 2:00 and 3:00 a.m. according to the testimony of some of the victims. There was no evidence as to any external illumination and, in view of the nature of the locale, there was no likelihood of any illumination except from headlights of approaching vehicles. The evidence certainly indicated that appellant and his cohorts were not merely throwing rocks at the cars themselves, but were deliberately aiming at the windshields and windows of the vehicles. The rocks they threw were not pebbles; they were of substantial size and thus dangerous instrumentalities.

The majority concludes, and I agree, that from those facts the jury could legitimately conclude that appellant and his exuberant cohorts entertained a specific intent to inflict serious injuries on some persons. But on whom? Assuming the miscreants could not see the people who were behind the windshields and the windows at which they were hurling stones, they had to be aware that each vehicle contained a driver, seated where he or she was extremely likely to be seriously injured by a rock thrown at the windshield or a window. Since there is a reasonable presumption or inference that one intends the natural and foreseeable consequences of his actions, it follows that the jury could infer that appellant entertained the specific intent to inflict serious and permanently disabling injuries on

the one known occupant of each vehicle, its driver. Of course, the jury could also infer from the evidence that appellant and the other rock hurlers were acting out of a more general evil design, "the dictate of a wicked, depraved, and malignant heart; *'un disposition a faire un male chose,'* " as Blackstone described criminal malice prepense or *malitia praecogitata.*[1] As pointed out by Judge Moylan, writing for this Court in *Smith v. State,* 41 Md. App. 277, 305, 398 A.2d 426 (1979), that sort of general malicious disposition to do an evil thing is not the specific intent required for guilt of this particular offense. Since the question is one of sufficiency of the evidence, we need not speculate which of the two inferences as to intent strike us as being more probable. Specific intent to disable the driver of each targeted vehicle was a *reasonable* permitted inference; that is enough to submit the issue to the jury.

The convictions for aggravated assault upon some of the passengers in the assailed vehicles present a considerably different problem, however. And it is with respect to those convictions that I feel compelled to dissent.

The majority refers to certain testimony from which it concludes that the rock throwers may have been able to see that the targeted vehicles carried one or more passengers in addition to the drivers. From testimony to the effect that occupants of some of the targeted vehicles were able to see their assailants quite well and that several of the vehicles were traveling in rather close proximity to each other, the majority concludes that an inference may be drawn that there was sufficient illumination to enable the assailants to see that there were passengers in the vehicles. The next step is the conclusion that if the jury could infer that appellant was aware that some cars contained one or more passengers in addition to the driver it could follow that inference up with an inference of specific intent to disable the passengers because permanently disabling injuries to the passengers would be the natural and foreseeable conse-

---

1. Blackstone, Commentaries, 198–99.

quences of appellant's conduct. In short, affirmance of the conviction for aggravated assaults upon the passengers requires the drawing of sequential inferences, the second inference being entirely dependent on the first.

It has been frequently stated that it is impermissible to "pile inference upon inference"; that a fact desired to be used circumstantially must itself be established by testimonial evidence rather than by inference. We specifically rejected that adage in *Finke v. State*, 56 Md.App. 450, 477–78, 468 A.2d 353 (1983), pointing out that it had been impliedly rejected in *Pressley v. State*, 295 Md. 143, 454 A.2d 347 (1983), and *Metz v. State*, 9 Md.App. 15, 262 A.2d 331 (1970); citing 1 Wigmore on Evidence § 41 (3rd Ed. 1940), which flatly states that "circumstantial evidence may be proved by the same kind"; and quoting Maxey, J. in *Neely v. Provident Life & Acc. Ins. Co.*, 322 Pa. 417, 185 A. 784 (1936):

> When jurors in their deliberation arrive at a process of reasoning at an acceptable inference of fact, they have a right to add such fact to any previous facts found by them and proceed by ratiocination from such fact or facts to additional inferences of fact and then proceed still further by like process until they arrive at the ultimate conclusion on the issue trying.

As we explained in *Finke:*

> Thus, if the jury finds from direct evidence the existence of facts A, B and C and can reasonably infer the existence of fact D therefrom, there is no logical reason why it may not then add fact D to its pool of findings and from the combination of facts A, B, C and D infer fact E.

56 Md.App. at 478, 468 A.2d 353.

The problem with the majority opinion in this case is that when the inferred fact of appellant's awareness of the presence of one or more passengers in a particular vehicle is added to the other facts established by the evidence, no reasonable inference of the final *factum probandum,* a specific intent to injure a specific person—can be drawn.

Sometime between 2:00 and 3:00 in the morning, appellant hurled a large rock at the windshield of a rapidly approaching car on an interstate highway. If, as it is reasonable to infer, he could not see whether the car had any occupant other than the driver, it is not unreasonable to infer that he intended to injure the driver. But if the trier of fact infers that appellant could discern the presence of other persons in the car, then he was hurling a rock at a group of people. It is still reasonable to infer that he had an intention to inflict serious bodily injuries. But upon whom? There can be no rational inference of a specific intent to injure one particular individual in the group, only a generalized malevolence, a depraved heart, aimed at a group of people and not a specific person. As the majority opinion states, "[I]t is permissible to infer that the one throwing the rocks did so with the intent to injure whoever was inside [the vehicle]." The statutory crime of assault with intent to maim, disfigure, or disable, however, requires proof of an assault upon or battery of *a* person with the specific intent to cause a specific type of harm to *that* person. Throwing rocks at a group of people with the realization, expectation, or even hope that one or more of them may be severely injured is a serious "depraved heart" offense that may be fittingly and severely punished as a common law assault or battery, but it is not a violation of art. 27, § 386.